## Case No. 6,698.

### HOPKIRK v. RANDOLPH et al.

[2 Brock. 132.] 1

Circuit Court, E. D. Virginia. May Term, 1824.

REAL PROPERTY—FRAUDULENT CONVEYANCE—LIABILITY OF DONEE.

1. It is a general principle that a voluntary conveyance, made by a person indebted at the time, is void as to the creditors whose debts existed when the gift was made. But, though the fact of the donor's being indebted at the time of such voluntary conveyance, is a strong badge of fraud, yet where the donor's fortune was ample, and a gift made by him to his daughter at her marriage was comparatively trivial, and the husband received and retained possession of the subject of the gift; though the donor afterwards became insolvent, the court refused to set the gift aside as fraudulent; a reasonable advancement, made under such circumstances, not being embraced by the statute of frauds.

[Cited in Anon., Case No. 474.]

[Cited in Huston's Adm'r v. Cantril, 11 Leigh, 159; Pomeroy v. Bailey, 43 N. H. 124; Robinson v. Boyd, 17 Mich. 134; Lockhard v. Beckley, 10 W. Va. 99, 107; French v. Holmes, 67 Me. 194.]

2. Quaere, how far the intervening marriage of the daughter would affect such a question, as between the creditors of the donor, and the husband of the daughter? Would the subsequent or contemporaneous marriage of the daughter render valid a gift which, independent of that marriage, would be void as to the antecedent creditors of the donor? It seems, that if the gift could be considered, in any fair construction, as the inducement to the marriage, the marriage would give validity to a gift, which, otherwise, would be void as to the creditors.

3. A father conveys a large portion of his estate to his sons, without valuable consideration, and directs that they shall execute bonds for a specific sum to a third person, the husband of the donor's daughter. This is virtually a charge upon the property, and is to be considered as if it was a gift from the father to his son-in-law directly, and the latter is liable to the creditors of the father, for any moneys received by him in satisfaction of such bonds.

[Cited in Dold v. Geiger, 2 Grat. 102.]

4. T. R. being possessed of a large estate, made a division of it among his three sons, A. C. R., I. R. and T. R., and in consideration thereof, directed them to execute their bonds to R. H., the husband of the donor's daughter, for £250 each. J. B. obtained a judgment against T. R., the elder, after the division of his estate. Execution on the judgment was stayed, the plaintiff entering into an agreement with A. C. R., whereby it was stipulated that A. C. R. should pay the debt in three annual instalments. T. R., the elder, and his three sons, all became insolvent before the payment of the said debt. Held, that the stay of execution does not discharge R. H. from his liability to pay to the creditor any money received by him in payment of the bonds, although, when the judgment was rendered, A. C. R. possessed sufficient property to satisfy it. The principle, that where any indulgence is extended by a creditor to his debtor, and the debtor subsequently becomes insolvent, the creditor loses his recourse against the security, does not apply in favour of a mere donee.

5. It seems, that where a father executes a voluntary bond to his son-in-law, the obligee will not be held responsible to the prior creditors of the father, for the money actually received in payment, in whole or in part, of the bond, such voluntary bond not being within the statute of frauds.

6. If several voluntary conveyances are made to different individuals, which are fraudulent as to creditors, the donees will not be held liable, only for the proportions which their respective gifts bear to the debts of the donor, but the whole of every such gift will be subjected to the payment of the debts of the donor.

7. T. R. conveyed lands to his three sons, without valuable consideration, who conveyed

---

1 [Reported by John W. Brockenbrough, Esq.]

them away to third persons. Quaere, are the lands in the hands of a purchaser liable to the claim of a creditor of the father? However this may be, the creditor cannot be compelled to proceed against such purchaser, and no decree would be rendered against him, in aid of a volunteer, who was able to pay the debt.

[Cited in Pratt v. Curtis, Case No. 11.375.]

[Cited in Ringold v. Suiter, 35 W. Va. 190, 13 S. E. 47.]

[See note at end of case.]

In equity.

MARSHALL, Circuit Justice. In the year 1790, the defendant, Randolph Harrison, intermarried with the defendant Mary, daughter of Thomas Randolph, deceased, who was then in possession of a maid-servant, a negro girl, and a riding-horse, which had been given her some years before by her father, who was at the time of the gift and of the intermarriage, possessed of a considerable estate. This property was, upon the intermarriage, retained by the donee, and has ever since remained in possession of Randolph Harrison. In the autumn of the year 1793, Thomas Randolph and his three sons, Archibald Cary, Isham, and Thomas, agreed on a division of his estate, and property to a large amount was conveyed to each of the sons, in consideration of love and natural affection, of certain specific debts, and also of bonds for £250, payable by each of them to their sister Mary Harrison. In the year 1795, John Bowman, styling himself surviving partner of Spiers, Bowman & Co., instituted a suit in this court against Thomas Randolph, and in May, 1796, obtained a judgment by confession for the debt in the declaration mentioned, to be discharged by the payment of $1,532 46, with interest at the rate of five per cent. per annum, from the 1st day of September, 1775, till paid, with costs. Execution on this judgment was stayed, and the judgment was to be discharged in equal instalments of one, two and three years. Archibald Cary Randolph, who transacted his father's business, made the agreement for the confession in his father's name, and engaged to pay the judgment according to its terms. To obtain his undertaking for the payment of the judgment appears to have been the principal motive with the plaintiff's agent for suspending execution. On the 25th of June, 1800, a fieri facias was issued, which was returned "no effects." Archibald Cary Randolph had wasted and misapplied the estate and crops of his father.

In 1800 or 1801, Thomas Randolph departed this life, intestate, and in the year 1803 James Hopkirk, stating himself to be the surviving partner of Spiers, Bowman & Co., filed his bill in this court, making Archibald Cary Randolph, administrator of Thomas Randolph, deceased, and the said Archibald Cary Randolph, Isham Randolph and Thomas Randolph, and Randolph Harrison, and Mary his wife, children and distributees of

Thomas Randolph, deceased, defendants thereto. The bill alleges that the estate of Thomas Randolph was considerable; that the deeds to his sons are fraudulent; that his children are in possession of property which ought to satisfy his debt, and prays a decree against them in such proportions as the court may direct, or such other decree as may be adapted to his case. Several accounts have been taken, and in the progress of the cause, it appears that the estate of Thomas Randolph, Sr., is wasted, and that all his sons are notoriously insolvent. The plaintiff claims the whole debt from his son-in-law, Randolph Harrison, or so much thereof as can be satisfied out of the property he has received with his wife. On the hearing, the court was of opinion that the personal representative of John Bowman ought to be a party, whereupon the bill was amended, and John Williams, administrator, &c. of John Bowman, deceased, was made a defendant, and his answer was filed, admitting the right of the plaintiff to the debt.

The defendant rests his defence on two grounds: First, he contends that receiving a judgment with a stay of execution, with a stipulation that Archibald Cary Randolph would pay the debt, changes its character, and amounts to a waiver of his claim upon the property in the hands of Randolph Harrison. Secondly, that the gifts to Randolph Harrison are not within the statute of frauds. 1. The judgment is against Thomas Randolph, Sr., and appears by the record to have been confessed by his attorney; this was probably under the instructions of Archibald Cary Randolph; but Archibald Cary Randolph acted as his agent, and it is to be presumed, from all the circumstances, with full power. The judgment could not merge in the agreement with Archibald Cary Randolph, and was indeed a part of that agreement; it was not understood that Thomas Randolph was to be discharged, and Archibald Cary Randolph substituted in his place; but that time was to be given to Thomas Randolph, in consideration of the collateral security furnished by the undertaking of Archibald Cary Randolph to pay the debt. But the defendant insists that the plaintiff, by disabling himself from proceeding against Thomas Randolph, has discharged Randolph Harrison, upon the principle that the same act would have discharged a security of Thomas Randolph. The two cases do not, in the opinion of the court, stand on the same reason. The creditor who gives time to his debtor, hinders the security from proceeding himself against the debtor to recover the money he may have paid. But had Mr. Harrison paid this debt, he could not have recovered it from Thomas Randolph. A volunteer who loses the property given him from defect of title, has no legal recourse against the donor at any time, unless there be an express warranty. I am, then, of opinion, that the stay

of execution, and the transactions with Archibald Cary Randolph, although the debt might certainly have been satisfied, had the creditor proceeded in the usual manner, constitute no bar to the present suit. They aggravate the hardship of the defendant's case, but do not constitute a defence at law or in this court.

2. I proceed, then, to the inquiry, how far the property which came to the possession of Randolph Harrison is liable to the creditors of Thomas Randolph? The words of the statute are, "every gift, &c., had, or made and contrived of malice, fraud, covin, collusion or guile, to the intent and purpose to delay, hinder, or defraud creditors of their just and lawful actions, &c. shall, from henceforth be deemed and taken (only, &c.) to be clearly and utterly void." Were this statute now for the first time to be expounded, the court would find much difficulty in construing it as directed against voluntary gifts or conveyances, merely because they were voluntary. The language of the act comprehends such as are made of malice, fraud, covin, collusion, or guile, with intent or purpose to delay, hinder, or defraud creditors. This intent or purpose, would be supposed to constitute the contaminating principle, which would infect and vitiate the gift or conveyance, and would be required to bring the particular case within the act. But as this intent is concealed within the bosom of the actors, it would be the duty of the court to infer it from the character of the transaction, and as the equity of the creditors is generally stronger than that of mere volunteers, the court ought to lean to the side of the creditor, and to consider every gift or voluntary conveyance as coming within the statute, the fairness of which was not conclusively proved. Even, independent of the statute, gifts or voluntary conveyances, which obviously defeated the claim of a creditor, would be considered as fraudulent, so far as regarded him. The donee, therefore, would always be required to prove the fairness of his title. If he be not a purchaser for a valuable consideration, it would be incumbent on him to show a case, not only without taint, but free from suspicion. If the circumstances of the gift be such that, according to any reasonable probability, it might originate in any impure motive, or might in fact prove injurious to creditors, by withdrawing a subject to which they had just pretensions, the fair construction of the act would comprehend it. But a construction which should, under all circumstances, comprehend every gift, merely because it was voluntary, might derange the ordinary course of society, and produce much greater injustice than it would prevent. A man, for example, of great opulence, owing some debts, feels himself bound to advance his children, when they leave him to act for themselves, and to perform their own parts on the great theatre of the world. His own feelings and public opinion would equally reproach him, should he withhold from them those aids which his circumstances and their education and station in life would seem to require. A reasonable advancement, under such circumstances, so far from being considered as collusive, or made with an intent to defraud creditors, would be obviously a provision required by justice and the common sense of mankind. If, after a long lapse of time, the child, having acquired credit in virtue of the estate, in his possession, and apparently his own, should, as well as his parent, become insolvent, all would admit that the equity of his creditors would be stronger than the equity of the creditors of his father. But should he not become insolvent, but should settle in life, marry in the visible possession of property given to him in good faith, as a reasonable provision made by an opulent parent, whose circumstances were not only unsuspected, but were in truth perfectly sound, the subsequent failure of that parent, at a distant period of time, could not reasonably be connected with that advancement, so as to impress upon it the stamp of fraud. No fraudulent intent, no intent to delay, or in any manner to injure creditors, could be inferred. The consequence could not be apprehended from the act, and, therefore, the act could not be considered as constructively fraudulent. It would seem to be a fair disposition of property, a fair exercise of the power of ownership, and not, I think, within the statute of frauds, were that statute now first to be first applied to such a case. But the statute has been long in force, and numerous decisions have been made upon it, both in England and in this country. Those decisions are admitted to bind this court. They determine, that a voluntary gift is void as to creditors, whose debts existed at the time the gift was made. This is the general principle, and as a general principle, it is believed to be unquestionably a sound one. Untrammelled by precedents, this court would, at this time and in this case, establish it. But the difference between a general principle, and one which is universal in its application, which is so inflexible as to permit no case to be withdrawn from it by any circumstances, however strong, which would make this act equivalent to an act annulling all gifts or voluntary conveyances, made by a person indebted at the time, however large his fortune, and however inconsiderable his debts or his gift, must be admitted by all. The extent of the principle, then, established by these decisions, must be ascertained by a review of the decisions themselves, of the terms in which they have been expressed, and of the circumstances to which those terms have been applied.

It has been truly observed that some shades of difference appear in the cases on this subject. Some judges have shown a disposition to press the principle farther than others, and

have expressed themselves in terms more or less favourable to the creditor or donee. Questions of this sort have been most common in chancery, but as courts of law have concurrent jurisdiction, and as they have received the same construction in both courts, it may be proper to notice the opinions that have been expressed by an eminent judge in a common law court. In the case of Cadogan v. Kennett, 1 Cowp. 434, Lord Mansfield said: "These statutes (Sts. 13 & 27 Eliz.) cannot receive too liberal a construction, or be too much extended in the suppression of fraud. The statute of 13 Eliz. c. 5, which relates to frauds against creditors, directs 'that no act whatever, done to defraud a creditor, shall be of any effect against such creditor or creditors;' but then, such a construction is not to be made in support of creditors as will make third persons sufferers. Therefore, the statute does not militate against any transaction, bona fide, and where there is no imagination of fraud. And so is the common law." In the case of Doe v. Routledge, 1 Cowp. 710, the same judge says: "A custom has prevailed, and leant extremely, to consider voluntary settlements fraudulent against creditors. But if the circumstances of the transaction show it was not fraudulent at the time, it is not within the meaning of the statutes, though no money was paid." In the same case he afterwards says: "One great circumstance, which should always be attended to in these transactions, is, whether the person was indebted at the time he made the settlement? If he was, it is a strong badge of fraud." Page 711. The impression made by these declarations of Lord Mansfield is, that every gift made by a person indebted at the time, is liable to great and serious objection, and is, to use his own expression, a strong badge of fraud, but is not, necessarily, and under all possible circumstances, absolutely fraudulent.

No English chancellor has leaned more to the creditors, in questions arising on these statutes, than Lord Hardwicke. In the case of Russel v. Hammond, 1 Atk. 13, Lord Hardwicke said: "A great deal has been said on this head, but it depends on circumstances, and every case varies in that respect. There are many opinions that every voluntary settlement is not fraudulent: what the judges mean is, that a settlement being voluntary, is not, for that reason, fraudulent, but an evidence of fraud only. Bovy's Case, 1 Vent. 193; Lord Teynham v. Mullins, 1 Mod. 119. Though I have hardly known one case where the person conveying was indebted at the time of the conveyance, that has not been deemed fraudulent." This strong expression of opinion against voluntary settlements, made by a person indebted at the time, was used in a case where the relative value of the subject settled to the estate, and debts of the settler is not indeed stated; but where there is reason to believe that it was considerable. It was made, too, in a case where

the settlement was in part supported, because it was made on a valuable consideration, and in part declared void, because it was made for the benefit of the settler himself. Trivial gifts, made without any view to creditors, with intentions obviously fair and proper, do not seem, from his language, to have been on the mind of the judge. It is observable, too, that he does not lay down the principle as being universal, but says, "he has hardly known one case where the person conveying was indebted at the time of the conveyance, that has not been deemed fraudulent." In Taylor v. Jones, 2 Atk. 600, the master of the rolls said: "I look upon it as being a standing rule as to creditors for a valuable consideration, that it" (a voluntary settlement after marriage) "is always looked upon as fraudulent, and within 13 Eliz. c. 5." This expression is certainly a very comprehensive one; but it is applied expressly to a family settlement, not to an inconsiderable gift, and is used in a case in which the settler reserved to himself an interest for his life. In the case of Lord Townshend v. Windham, 2 Ves. Sr. 11, the chancellor said: "But I know no case on the 13th Eliz. where a man, indebted at the time, makes a mere voluntary conveyance to a child without consideration, and dies indebted, but that it shall be considered as part of his estate for the benefit of his creditors." This language is undoubtedly very strong, but it is used in a case in which the father had, by deed, in pursuance of a general power, appointed money to be raised for the benefit of his daughter. The case was, in substance, this:—Mr. Windham, being seised for life of a large estate, remainder to his nephew in tail, covenanted that his nephew should take the profits during his life, on his permitting any person whom Mr. Windham should appoint, by deed or will, to take the profits for the same length of time after the estate should come to the nephew. The testator, by deed, appointed that his daughter should take these profits, and it being determined that they were part of the general assets, the chancellor declared them liable to the claims of creditors. This language, therefore, is applied to a conveyance which is to take effect after the death of the testator. It may well be doubted whether the nephew could have been compelled to relinquish the profits received, had the conveyance to him been purely voluntary.

In the case of Kidney v. Coussmaker, 12 Ves. 136, the general doctrine that a voluntary settlement is void as to creditors, is again recognised; but that, too, was a settlement affecting a considerable portion of the property of the settler. The books are full of cases in which the principle is acted on as one perfectly settled; but in all of them, so far as my researches have gone, there has been a conveyance of property to a considerable amount—some settlement of a thing still existing—or some bond or contract to be complied with in future. The case of

Partridge v. Gopp, 2 Amb. 596, cited by the defendant, is a case of a gift of money; but that case is obviously founded on the actual fraudulent intent of the giver. The suit was brought by the legatees of Edward Godfrey, against his executors, for an account of the personal estate of the testator, and to have a legacy of £6000 secured. An account was directed in 1736, and Joseph Sewell, one of the executors, was reported to be largely indebted. He was, in 1745, committed to the Fleet prison, for not complying with an order of court, directing him to pay into the bank £3000, part of the money in his hands, where he remained till 1750, when he died insolvent. The plaintiffs brought a supplemental bill against his children, four daughters, who had been advanced by Sewell in his lifetime. Two of the daughters were married, and the bill was dismissed at the hearing as to them, because the money they had received was given as marriage portions. The two remaining daughters were single, and stated in their answers, each of them, that she had received £500, in December, 1743, as a free gift for her maintenance and subsistence in the world. The chancellor took time to consider whether this money should be refunded. He says: "It struck me at first as a hardship to make the children refund, especially as such a gift could not be considered as a trust for the giver; but, on consideration, I think no man has such a power over his own property to dispose of it so as to defeat his creditors, unless for consideration. It is the motive of the giver, not the knowledge of the acceptor, that is to weigh. The statute extends to all cases except where there is good consideration, and bona fide; blood has been held not to be a good consideration. I have no doubt but that this voluntary gift proceeded from affection getting the better of justice." "It was done secretly and pendente lite." His lordship was asked, for the information of the bar, who thought he had laid down the position too broadly, whether he did not mean to confine it to the circumstances of the case? That, otherwise, a parent could not make any gift whatever, of ever so small value, to his child, without its being liable to be taken away in favour of creditors; to which he said "that the fraudulent intent is to be collected from the magnitude and value of the gift." The idea of the bar that the chancellor had laid down the position too broadly, must have been founded on the words: "I think no man has such a power over his own property to dispose of it so as to defeat his creditors, unless for consideration." "The statute extends to all cases except where there is good consideration, and bona fide." These words, it was supposed by the gentlemen of the bar, would extend to any present whatever, of ever so small a value, a parent might make to his child. His lordship confines their application to gifts of magnitude and value. In the case itself, the gifts were of very great value, compared with

the property of the giver, and were made under circumstances which exposed them, in an eminent degree, to the charge of being made for the purpose of defrauding creditors.

The case of Chamberlayne v. Temple (decided in the court of appeals of Virginia) 2 Rand. (Va.) 384, is a case where a parent, much indebted at the time, disposed of a considerable portion of his property among his children, and afterwards died insolvent. It is true that he retained enough to pay his debts, and that his insolvency was produced by misfortunes and accident; but the property conveyed away was very considerable, and the most valuable part of that which he retained, consisted of vessels, and of the slaves who worked them. A circumstance, too, which is, I think, entitled to great consideration in that case, is, that the children were infants, residing with their father, so that the slaves given still remained in his possession. The gifts were not made to advance his children in the world, and it is difficult to conceive any motive for making them at the time, other than a desire to secure them for his children from the claims of his creditors. That case is a construction by the highest tribunal of our country of a statute of this state, and undoubtedly complete authority as far as it goes; but it does not, I think, go at all beyond the English decisions. I should not, I think, even before the case of Chamberlayne v. Temple, have hesitated to have determined such a conveyance to be fraudulent under our statute. It was a voluntary conveyance of a very large portion of the donor's estate, made by a person in embarrassed circumstances, to infants who were not at the time in need of any immediate provision, and who were not in a situation to take the property out of his possession. In the case of Sexton v. Wheaton, 8 Wheat. [21 U. S.] 229, 5 Cond. R. 425, cited in [Hinde v. Longworth] 11 Wheat. [24 U. S.] 199, 6 Cond. R. 270,[2] the supreme court of the United States has said "that in construing the statute of 13 Eliz., the courts have considered every conveyance, not made on consideration deemed valuable in law, as void against previous creditors." This is a gen-

---

[2] In this last case, the supreme court say, that "a deed from a parent to a child, for the consideration of love and affection, is not absolutely void as against creditors. It may be so under certain circumstances: but the mere fact of being in debt to a small amount would not make the deed fraudulent, if it could be shown that the grantor was in prosperous circumstances and unembarrassed, and that the gift to the child was a reasonable provision according to his state and condition in life, and leaving enough for the payment of the debts of the grantor. The want of a valuable consideration may be a badge of fraud, but it is only presumptive, and not conclusive evidence of it, and may be met and rebutted by evidence on the other side." See, also, Ridgway v. Underwood [Case No. 11,815]: Gilmore v. North American Land Co. [Id. 5,448]. See, also, the case of Land v. Jeffries, 5 Rand. (Va.) 211, where the doctrine of fraud per se is very elaborately discussed.

eral proposition concerning the extent of the English divisions, not a decision of the court itself declaring that every gift, however trivial, is at any distance of time, and under any circumstances, to be avoided by a creditor. The term "conveyance" indicates property of considerable value, as respects the situation of the parties, since it is chiefly in such cases that voluntary donations of personal chattels assume the form of conveyance. The general proposition was all which could be in the mind of the court, since the case was one of a subsequent purchaser, and did not lead to any minute investigation of the distinctions which might possibly exist in cases of gifts made by persons indebted at the time. As a general proposition, it is unquestionably true. No voluntary conveyance of property has been sustained against creditors whose debts existed at the time, but no gift of such inconsiderable value as to come under the denomination of a present, made under circumstances entirely free from suspicion, has ever, so far as I am informed, been hunted up by a creditor, and claimed as a part of the donor's estate.

I will now proceed to a particular consideration of the several items which constitute the subject of the present controversy. The first is, the gifts made by Thomas Randolph to his daughter, prior to her intermarriage with Randolph Harrison, which, on the marriage in 1790, were taken into the possession of her husband as her property. These were two negro girls, one of them an attendant on her person, and a riding-horse. Thomas Randolph was a gentleman of ample fortune, not embarrassed in his circumstances, nor so much indebted as to create any suspicion of difficulty in the payment of his debts. The idea cannot be admitted for a moment, that any apprehension concerning his creditors was, in any manner, connected with the motives to this gift. That of the waiting-maid and that of the riding-horse especially, are usual in this country, and come strictly, when made by a parent of unquestionable solidity, within that class of gifts which are denominated presents. They do not much differ from wedding-clothes, if rather more expensive than usual, from jewels, or an instrument of music, given by a man whose circumstances justify the gift. I have never known a case in which such gifts, so made, have been called into question. These gifts come, I think, completely within that class of presents, which, according to the case reported by Ambler, (page 596, see supra), ought to be excepted from the general rule in favour of creditors. The gift of the other girl is not, I think, so perfectly clear; but I find great difficulty in separating it from the waiting-maid, both having been given with intentions perfectly fair, and both having passed together to the husband at the time of the marriage, and having remained in his possession ever since. This case bears no resemblance to that of Chamberlayne v. Temple. If it did, I should not hesitate to follow the opinion of the court of appeals. But the distinction between them is too obvious to require that I should contrast them. In the case of Jacks v. Tunnò (decided in South Carolina) 3 Desaus. Eq. 1, a trader, supposed to be in good circumstances at the time, though considerably in debt, purchased a house and lot, which was conveyed to the plaintiffs, his infant daughters. A few years afterwards he became bankrupt, and this bill was brought by the donees to restrain the defendants, who are not stated to be, but I presume were, the assignees of the bankrupt, from selling the property. The injunction was made perpetual; and, in giving his opinion, Chancellor Rutledge said: "Suppose, for instance, a person in this state being indebted, though to a considerable amount, is possessed of a large estate in houses in the city, gives a small part of that property to his child or children; or one, similarly circumstanced and indebted, possessed of a considerable estate in land and negroes, gives a few negroes and some land to his children, and either the accident of fire in the city, or the death of his negroes, should reduce his estate so considerably as to occasion his insolvency—would this court, under such circumstances, merely because the person was largely indebted at the time of the gift, consider such gift as fraudulent, and set it aside, because creditors were interested? I should apprehend not." In the case of Salmon v. Bennett, 1 Conn. 525, the court says: "Where there is no actual fraudulent intent, and a voluntary conveyance is made to a child in consideration of love and affection, if the grantor is in prosperous circumstances, unembarrassed, and not considerably indebted, and the gift is a reasonable provision for the child, according to his estate and condition in life, comprehending but a small portion of his estate, leaving ample funds, unemcumbered, for the payment of the grantor's debts, then such conveyance will be valid against creditors existing at the time."

These cases are cited, not as having the authority which the decisions of our court of appeals would have in this court, but as containing a great deal of good sense, and being entitled to great respect. If the two girls and this riding-horse are to be considered as given before the marriage, so as to have become ostensibly the property of the young lady to whom they were given, there would be some difficulty, the perfect fairness of the gift being shown, in setting aside the rights of the husband. In East India Co. v. Clavell, Finch, Préc. 377, Sir Edward Lyttleton, being appointed by the East India Company president at Bengal, entered into articles of agreement, on the 16th of January, 1698, for the faithful execution of the trust; and also gave his bond, binding his

heirs in the penalty of £2000, conditioned for the performance of the covenant. Afterwards, on the 21st of the same month, he made a settlement on his daughter of £5000, to be raised out of land, and sailed for the East Indies. Some time after the departure of Sir Edward, Mr. Clavell made an application to the young lady in the way of marriage, and she placed the settlement in his hands. Being advised that it was valid, marriage took effect, sometime after which Mrs. Clavell died without issue. Mr. Clavell administered on her estate, and brought his bill to have the money raised as directed by the settlement. Sir Edward Lyttleton had embezzled the effects of the company to the amount of £26,000, and they claimed this money, the settlement being voluntary. The counsel for Mr. Clavell contended, that if the settlement was voluntary in its creation, yet being the motive and inducement to Mr. Clavell to marry her, this had now made it valuable. The lord chancellor thought the settlement a reasonable provision, without colour of fraud. The articles did not bind the real estate, and the bond bound it only to the extent of the penalty. He directed the amount of the settlement, except as to the £2000, the penalty of the bond, to be paid to Mr. Clevall. There is some difficulty in ascertaining the principle of this case. Most probably, the decision turned upon the point that the debt to the East India Company could not affect the subject out of which the £5000 were to be raised. Yet, in argument, the circumstance that the settlement might have influenced her marriage was considered important. I cite it, because it was mentioned in a subsequent case as deserving consideration on that account. In George v. Milbanke, 9 Ves. 190, the case was this: In July, 1797, Sir Ralph Milbanke directed, by deed poll, that £500 should be raised immediately after his decease, out of certain trust premises, for the benefit of his natural son, George Milbanke, and died in January, 1798. In February, 1798, George Milbanke, in consideration of £400, assigned this money to Frederick Glenton and Thomas Peacock, subject to redemption on the payment of £400 with interest. The bill was brought by a specialty creditor of Sir Ralph Milbanke, to subject this fund to his debt. The case was decided, as it respected the £400, in favour of Glenton and Peacock, because their equity being to the specific article, was superior to that of the general creditors. In the argument of the case, the Case of the East India Company and Clavell was cited from Bacon's Abridgment. The lord chancellor said: "If the doctrine is rightly collected from the authorities, it imports all this: that if a man is indebted, and makes a provision for his child by a pure voluntary settlement, and that child afterwards marries, the circumstance of its leading to the marriage makes the settlement good against creditors, though

it would have been bad if no marriage had taken place. I doubt whether it will not be found in the circumstances of that case, that the child was not a pure volunteer. If it can be supported, as here stated, it goes a great way to decide this case; for though this is the case of a stranger, it makes no difference between a voluntary settlement, made good by a subsequent marriage, and one made good by a subsequent advance of money." Undoubtedly neither of these cases establishes the principle, that a subsequent marriage will make a voluntary settlement good, and yet the chancellor treats that point as if such subsequent marriage was not without its weight.[3]

If the gift was made at the time of the marriage, the claim of the husband will not be weakened by that circumstance. A reasonable gift, made contemporaneously with a marriage, and accompanied with a delivery of possession, has strong claims to being considered as a gift in consideration of the marriage. Where the circumstances of the party exclude the idea of any interference on the part of creditors, it is not usual to convey, by deed, property which passes by delivery, nor to use the solemnity of delivery expressly in consideration of marriage, although that may be the real consideration. I do not, however, place this case on that ground. I think a customary and inconsiderable gift from a parent to a child, which may properly be denominated a present, and which is free from all suspicion of an intention to defraud or injure creditors, cannot, if by subsequent mismanagement the estate of the parent be wasted, be considered as a fraudulent gift at common law or under the statute. There was also a negro girl sent on the birth of Mrs. Harrison's first child. But this girl was sent as a present to the child. In 1793 Thomas Randolph divided the greater part of his estate among his sons, stipulating that each of

---

[3] A voluntary deed of settlement to a child of the grantor is void, as against a subsequent purchaser for a valuable consideration (under 27 Eliz.), with only implied notice of the previous deed, but any intervening valuable consideration will render the deed valid. As where the grantee in the voluntary deed gains credit by the conveyance, and a person is induced to marry her, on account of the provisions made for her in the deed, such conveyance, on the marriage, ceases to be voluntary, and becomes good against a subsequent bona fide purchaser for a valuable consideration. Nor does it matter whether any particular marriage was in contemplation at the time of the settlement or not. Kent, chancellor, in Sterry v. Arden; 1 Johns. Ch. 261. But a settlement after marriage in pursuance of a parol agreement entered into before marriage, is not valid: aliter, if the agreement was a written one, entered into prior to the marriage. And a voluntary settlement after the marriage, by a person indebted at the time, is fraudulent and void against creditors; and that, without regard to the amount of the existing debts, or the extent of the property settled, or the circumstances of the party. See Chancellor Kent's opinion in Reade v. Livingston, 3 Johns. Ch. 481.

them should pay certain debts, and should execute a bond to Randolph Harrison for £250. Randolph Harrison took no part in this arrangement, but afterwards parted with the bonds to persons, and for a sum not mentioned in the proceedings. The estates given by Thomas Randolph to his children, were of much greater value than the debts or money they were directed to pay, and no provision was made for the debt due to Spiers, Bowman & Co. Where a conveyance is made to children of property to a large amount, charged with debts bearing no proportion to its value, the children cannot be considered as purchasers of the whole, but must take the clear surplus value of the property as volunteers. With respect to this debt, for which no provision was made, such voluntary conveyance, according to all the cases, must be considered as fraudulent. But the property thus conveyed is wasted, and is beyond the reach of the creditor. How are the bonds given by the sons to be considered? This question is not without its difficulties. They were given by the sons, in part payment for the property conveyed to them by their father, not to their father, but directly to Randolph Harrison. I have felt some doubt whether such bonds were within the statute, but upon the best consideration I can give the subject, the opinion I have formed, is, that as they are in fact the gift of the father to his daughter, they are in substance equivalent to a charge upon the property, conveyed to the sons, which charge would be as liable to creditors as the property itself. I therefore consider Mr. Harrison as liable for these bonds, but liable only for the amount actually received on them. Had they never been paid, it cannot be pretended that he would be accountable for their amount to the creditors. If it cannot, then he will, I think, be at liberty to show what was the amount actually received.[4]

The subject which remains to be considered is the bond given to Mr. Harrison by Mr. Randolph himself. Supposing this to be an obligation which bound Mr. Randolph to the payment of money, the question is, whether Randolph Harrison is liable for the money actually received upon it? I think the cases of Stiles v. Attorney General, 2 Atk. 152, Gilham v. Locke, 9 Ves. 613, and Ex parte Berry, 19 Ves. 218, decide this question in the negative. They decide that satisfaction by bond, and I think, by payment, of what is due on a voluntary bond or conveyance, is not to be considered as a voluntary act within the statute. If, then, this

bond is to be considered as binding in its terms, I do not think Randolph Harrison accountable for the amount received upon it. If it is not binding, it is nothing, and Randolph Harrison can only be charged with the amount actually paid by Thomas Randolph, of which there is no evidence before the court. It is, however, a subject into which an inquiry would be useless, because the bonds given by the three sons would, on any probable estimate of their value, exceed the amount of the debt due the plaintiff.

According to the former course of this court, founded on what was supposed to be the course of the state courts, Randolph Harrison would be accountable only for such proportion of the debts of Thomas Randolph, as the property received by him bore to the property received by the sons. But that principle is completely overturned by the case of Chamberlayne v. Temple, and I conceive it as now settled, that the whole sum is liable to the claims of creditors. If it be, then the decree must be, that the defendant pay to the plaintiff the sum of $3064 92; to be discharged by the payment of $1532 46, the debt in the declaration mentioned, that being the amount of the judgment rendered in this court against Thomas Randolph in favour of John Bowman, as surviving partner of Spiers, Bowman & Co., in May, 1796.

Upon a re-argument of this case at the same term, the Chief Justice delivered the following opinion:

MARSHALL, Chief Justice. A re-argument of this case having been granted at the request of the counsel for Randolph Harrison, it has been re-considered by the court. The argument has turned chiefly on two points: 1. That the whole estate conveyed to the sons, is chargeable with this debt. 2. That a gift of money by a parent to a child, not really made with a fraudulent intent, is not constructively fraudulent under the statute.

1. That the whole debt should be paid by the sons, were they now solvent, and before the court, will be readily admitted; but two of them are dead insolvent, and the third, who is now alive, is admitted to be insolvent. The creditor can receive nothing from that source. It is insisted that the land is liable in the hands of the purchasers. Of this I am not confident; but were it to be admitted that a person who holds by purchase from a volunteer, takes the property subject to the creditors of the original donor, I should still be of opinion that the creditor would not be compellable to proceed against such purchaser, and I should also think that no decree could be made against him, in aid of a volunteer who was able to pay the debt. Eppes v. Randolph, 2 Call, 183.[5]

---

[4] The defendant, Randolph Harrison, admits in his answer, that he had collected the bonds executed by the three sons of Thomas Randolph, but does not state the terms on which those negotiations were effected. The depositions filed in the cause, however, show that the bonds were, at a fair valuation, worth more than the amount of the debt due by Thomas Randolph, the elder, to the firm of Spiers, Bowman & Co.

[5] [See note at end of case.]

2. It is true, that few cases are to be found in the books, in which a child has been decreed to refund money actually received from a parent. From the nature of the transaction, such gifts would not frequently be the subject of inquiry. Where they are inconsiderable in amount, they are seldom made the subject of inquiry; and, were they even looked into, would, perhaps, not be deemed fraudulent; and where large advances are made, they most generally consist of money in the funds, or charged on lands; but in the case of Partridge v. Gopp, reported in 2 Amb. 596, a gift of money to a child was declared fraudulent as against creditors, and the chancellor founded his opinion on the magnitude and value of the gift. That case was, it is true, tainted with circumstances leading strongly to the opinion, that the gift was made for the purpose of providing for his family at the expense of a creditor, but the chancellor places his decree chiefly on the magnitude of the gift; the fraud was inferred, in a great degree, from that circumstance. In the case at bar, the gift to Randolph Harrison forms a part of a more considerable transaction, and cannot easily be separated from it. That transaction was the division of the estate of Thomas Randolph among all his children; though only a small portion was allotted to Randolph Harrison, that small part must, I think, partake of the character of the whole transaction. It would be very difficult to relieve this whole family arrangement entirely, from the taint of being made, at any rate, without sufficient regard to the claim of a creditor not provided for. It has been said at the bar, that there was a general promise on the part of the sons to pay any debts which might appear; but there is no proof of such promise; and had any debt, not mentioned in the conveyances, formed a part of the consideration, a stipulation to that effect ought to have been inserted. It has been said with some probability, that this debt was forgotten; but however satisfactory this excuse may be in an inquiry into the morality of the arrangement, it would be dangerous to admit it in an inquiry into its legality. The cases of Gilham v. Locke, 9 Ves. 612, and Ex parte Berry, 19 Ves. 218, from which it is inferred, that money paid in discharge of a voluntary bond is not within the statute, rather support the opinion, I think, that money given in the first instance, not under the obligation of such bond, would be within the statute. The validity of such payment would not, I think, have been placed on the obligation which a voluntary bond creates between the parties, if the advance of the money, independent of such prior obligation, had been considered as beyond the reach of the statute. This case is one of extreme hardship, which ought not to be carried beyond express authority; but I think myself bound to adhere to the decree in favour of the plaintiff.

NOTE. The question how far purchasers from a debtor (or his voluntary grantee) are entitled to protection in a court of equity from the claims of the creditors of the grantor, has frequently been the subject of laborious investigation in our courts, and it may not be amiss here to present a brief review of some of the leading cases in which it has been discussed. The question depends upon the construction of the proviso in our statute of frauds, which declares that the act shall not extend to any estate or interest in any lands, goods, or chattels, or any rents, common, or profits out of the same, which shall be upon good consideration, and bona fide, lawfully conveyed or assured to any person or persons, bodies politic or corporate. 1 Rev. Code 1819, p. 373, § 3. This is substantially the same proviso contained in the English statute of 13 Eliz.,—Green, J., in Garland v. Rives, 4 Rand. (Va.) 305; and the term "good" consideration has been interpreted to mean "valuable" consideration,—Twyne's Case, 2 Coke, pt. 3, p. 80; Hodgson v. Butts, 3 Cranch [7 U. S.] 157; 1 Cond. R. 476. In Eppes v. Randolph [2 Call, 183], the court of appeals (by Pendleton, president), "laid down this general proposition, that where a creditor takes no specific security from his debtor, he trusts him upon the general credit of his property, and a confidence that he will not diminish it to his prejudice. He has, therefore, a claim upon all that property whilst it remains in the hands of the debtor, and may pursue it into the hands of a mere volunteer; but not having restrained the debtor's power of alienation, if he or his volunteer convey to fair purchasers, they, having the law and equal equity, will be protected against the creditors." This proposition is cited and recognised as the true exposition of the doctrine by Coalter, J., in Coutts v. Greenhow, 2 Munf. 368. And a grantee claiming under a deed made by his father (the debtor), in consequence of a marriage agreement between the father of the grantee and his wife, is a purchaser for valuable consideration, and not a volunteer. Eppes v. Randolph [supra]. Under the proviso of the 13th Eliz., the purchaser, whether from the debtor himself, or his voluntary or fraudulent grantee, was protected, if he had not notice of the fraud of his own grantor; so that the bona fides was required only of the purchaser. And this is the just construction of the Virginia statute. Green, J., in Garland v. Rives, 4 Rand. (Va.) 305. But in the lasts case, the purchaser having had full notice of the fraud, and of the invalidity of the grantee's title, it was *held*: that upon general principles of equity, he could acquire no better right than they had; and upon the terms of the statute (13 & 27 Eliz., adopted in our Code) he could not be protected as a bona fide purchaser, but must stand, to all intents and purposes, in the shoes of the grantees. In Coleman v. Cocke, 6 Rand. (Va.) 618, a father purchased land, and took and retained for several years, possession as the beneficial owner thereof, but the purchase-money was not paid, and the lands were not conveyed to him; and when the purchase-money was paid, the father being greatly indebted, directed the vendor to make the conveyance to his son. The lands were accordingly conveyed to the son, no valuable consideration moving from the son, and the son sold them to a fair and bona fide purchaser, without notice of any fraud. The purchaser was held to be protected from the claims of the creditors of the father by the proviso in the statute. From the above summary it is clear that the doctrine is firmly settled in Virginia, that a fair, bona fide purchaser, for valuable consideration, without notice, is entitled to protection from the claims of creditors, whether the purchase was from the debtor himself, or his voluntary or fraudulent grantee. Some discrepancy of opinion seems, however, to have prevailed between learned judges elsewhere on the con-

struction of these statutes of 13 & 27 Eliz. Thus, in Roberts v. Andersons, 3 Johns. Ch. 377, Chancellor Kent recognises the rule as settled, that a purchaser for a valuable consideration, without notice, from a voluntary or fraudulent grantee, shall be preferred to a subsequent purchaser for valuable consideration, without notice, from the original grantor (under 27 Eliz.). But in relation to 13 Eliz., which was made to protect creditors from fraudulent conveyances, Chancellor Kent said that a different rule of construction prevailed: that the proviso in the act applied only to the original conveyance, and saved it, when made to a bona fide purchaser for a valuable consideration, however fraudulent the intent of the grantor might be, but did not extend to a purchase, however fair, on the part of the purchaser, from the voluntary or fraudulent grantee. Chancellor Kent concurred herein with the supreme court of errors of Connecticut, in Preston v. Crofut, 1 Conn. 527, in the construction of their statute of frauds, which, he said, "was substantially the same as the statutes of Elizabeth." In Bean v. Smith [Case No. 1,174], Judge Story reviewed the cases of Roberts v. Andersons, and Preston v. Crofut, and expressed the opinion that the proviso in the statute applied to estates derived from the fraudulent grantee, precisely as it did to those derived from the fraudulent grantor; that the statute of frauds had been universally considered as an exposition of the common law, and he regarded his construction of the proviso as in accordance with the principles of the common law. Judge Story's construction is supported by the opinion of Chief Justice Parsons, in Gore v. Brazier, 3 Mass. 541, and that of Chief Justice Parker, in Trull v. Bigelow, 16 Mass. 418, 419, and seems to be supported by that of Judge Spencer, in the case of Sands v. Hildreth, 14 Johns. 498.