POMEROY *v.* BAILEY.

A voluntary conveyance, in consideration of blood and affection, by a person not indebted or not in embarrassed circumstances, but leaving ample means in his hands, open to attachment, to pay all his debts, is good against creditors, if made *bonâ fide.*

Whether it was *bonâ fide* in such case or not, is a question of fact for the jury, upon consideration of all the circumstances attending it.

Where the consideration expressed in a deed is "five hundred dollars and other good causes and considerations," it is competent to aver and prove the consideration of blood.

To prove a contract to have been made with a fraudulent intent, such intent, in each party, may be shown by separate and independent acts and declarations.

Where the execution debtor is permitted to remain in possession of the land levied upon, his declarations, showing under what claim he holds possession, are admissible, as bearing upon the good faith of the judgment and extent.

THIS was a writ of entry for a tract of land in Haverhill.    The plaintiff claimed under an extent of execution against Hannah Dow, made October 28, 1853, and the defendant under a prior deed from Hannah Dow to Moses D. Hazeltine, of August 14, 1852, and which title came to the defendant through Eleazer Smith, April 12, 1858.

The plaintiff's position was, that the deed to Hazeltine was fraudulent and void as to creditors; and, on the other hand, the defendant contended that the plaintiff was not a creditor of Hannah Dow, but that the claim upon which he obtained judgment was fictitious, and got up between the parties collusively, to defeat the conveyance to Hazeltine; and evidence was offered, both for and against this position.

The consideration expressed in the deed to Hazeltine, who appeared to be a relative of the grantor, was "$500 and other good causes and considerations;" but no other proof was offered of any consideration for that conveyance, or the conveyances by Hazeltine to Smith, or Smith to the defendant.

The plaintiff's evidence tended to prove that the conveyance to Hazeltine was made with the intent to defeat one of her creditors, or a person who claimed to be such; and, on the other hand, it appeared that, after said Hannah's conveyance to Hazeltine, she retained a considerable property, some of which was open to attachment, and that at her death, in the autumn of 1853, she left nearly $4000, after paying her debts, to be divided among her legatees.

The plaintiff's claim was an account annexed to his writ, amounting to $1329.44, consisting of sundry items for board, nursing, physicians' bills, money, and services about her business, ranging from September 1, 1844, to February 1, 1852. The board and money, constituting about $900 of the claim, were charged as furnished at two different periods: from September 1, 1844, to June, 1845, and from September, 1847, to June, 1848.

The evidence tended to show that Miss Dow's residence, for many years before her death, was upon the premises in dispute, in Haverhill, and that, at the times for which board is charged, she was spending the winters in New-York, in the family of the plaintiff, who was also a relative; and the plaintiff's evidence tended to show that she was there in the capacity of a boarder, and agreed to pay accordingly. It appeared that, at the time this claim of the plaintiff was sued, which was September 7, 1853, the account was made out at Haverhill, in presence of the parties, and agreed to by her.

The defendant, on the other hand, contended that said Hannah was in the plaintiff's family merely as a visitor, and with no expectation, on either side, that she was to pay for her board; and he offered evidence tending to prove it. He also contended and offered evidence tending to prove that this agreement by Hannah Dow to the validity of the claim was collusive, and for the purpose of enabling the plaintiff to dispossess the defendant of this property.

The rest of the facts sufficiently appear in the opinion of the court.

*Hibbard*, and *Felton*, for the plaintiff.

*Bingham*, and *Bryant*, for the defendant.

Bellows, J. Various questions arise upon the case, and one of the most important has respect to the instructions given to the jury.

The plaintiff asked the court to charge the jury in substance, that, if his claim was legal and valid, and the conveyance to Hazeltine was without sufficient consideration, or there was a secret trust, or it was made to prevent an attachment on any claim, whether doubtful or not, then such conveyance was fraudulent and void as to the plaintiff, whatever may have been the amount of his claim.

Assuming the instructions prayed for to be substantially correct and applicable to the case, as it stood before the jury, let us see what instructions were actually given, notwithstanding the refusal, in terms, to give what were asked for. The court did instruct the jury, that if the plaintiff's claim was legal and valid, and a secret trust was reserved, or the purpose was to prevent an attachment upon some claim, whether doubtful or not, then such conveyance was fraudulent and void as to such claim of the plaintiff.

So far, we think, the instructions accord with the prayer of the plaintiff's counsel, and are not open to objection. As to the further request, in respect to the want of sufficient consideration, the court instructed the jury that a voluntary conveyance as a gift, or in consideration of blood and affection, the effect of which was to hinder and defraud creditors, would be void as against them ; but when made as a gift or the consideration of blood, by a person not indebted or not in embarrassed circumstances, and when large and ample means were still left in the hands of the grantor, open to be levied upon, known to the creditor, and amply sufficient to satisfy his debt and all other debts of the grantor, the conveyance would not be void, and that the creditor would not be at liberty to pass by the property still retained, and levy upon that so conveyed.

There was no error, we think, in declining to charge the jury, in the unqualified form, that the conveyance was void if without sufficient consideration, inasmuch as that naked statement would furnish no guide to the jury without explaining what would be " a sufficient consideration," and it would, in fact, be quite likely to mislead them.

The court undertook to explain what would be a sufficient consideration under the circumstances stated, and now the question is, whether there was error in that part of the charge.

The substance of it was that a conveyance of land as a gift, or in consideration of blood, by a person not indebted or not in embarrassed circumstances, but having ample means to pay all the grantor's debts, would be good against creditors. If by this it was intended to lay down the broad doctrine that such a conveyance would be good, even if made with the intent to defraud creditors, we think it would be erroneous ; because the conveyance must not only be upon good consideration, but *bonâ fide.* If not in good faith, but with intent to defeat creditors, it would be void as to subsequent creditors, even though existing creditors had all obtained payment out of property remaining after such conveyance. Was this broad doctrine the one intended ? or was the language likely to be so understood, and so to mislead the jury ? Taken in connection with the preceding part of the charge, to the effect that the conveyance would be void if intended to prevent an attachment, upon some claim doubtful or otherwise, we

think the court could not have intended to assert the broad doctrine alluded to. Nor do we feel satisfied that the jury were likely to be misled by it, especially when they were distinctly told that all conveyances, made with the intention of delaying and defrauding creditors, were void, as against both existing and subsequent creditors.

The question, then, is, were the instructions correct as applied to a conveyance for the consideration of blood? To be sure, that consideration is not expressed in the deed, but, under the statement used here of " $500 and other good causes and considerations," it is competent to aver and prove the consideration of blood; and this is not inconsistent with the deed, but stands with it. Such is the doctrine of *Mildmay's Case*, 1 Co. 175; *Bedell's Case*, 7 Co. 40; 1 Phill. Ev. 549; 1 Greenl. Ev., sec. 304; *Morse* v. *Shattuck*, 4 N. H. 229; *Pritchard* v. *Brown*, 4 N. H. 397; *Buffum* v. *Green*, 5 N. H. 71; *Graves* v. *Ticknor*, 29 N. H. 144. Here the evidence reported tends to show such a consideration, and it is assumed by the course of the trial to be the defendant's case. The inquiry then is, whether a conveyance made upon such consideration, by a person not in debt or not in embarrassed circumstances, but leaving in the grantor's hands large and ample means, open to be levied upon, known to the creditor, and amply sufficient to pay all his debts, is void as against creditors, in a case where no bad faith is shown. In *Reade* v. *Livingstone*, 3 Johns. Ch. 481, Mr. Chancellor Kent, upon great consideration, lays down the law to be, that if the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and no circumstance will permit those debts to be affected by the settlement, or repel the legal presumption of fraud. And he holds further, that this presumption does not depend upon the amount of the debts or the extent of the property in settlement, or the circumstances of the party. To allow any distinction, founded upon such circumstances, would, in his judgment, be embarrassing if not dangerous to the rights of the creditor, and prove an inlet to fraud, and, therefore, no such settlement should be allowed to stand in the way of existing debts.

These views were expressed by Chancellor Kent, as the fair result of the early English decisions; but it will be observed that most of those cited by him were suits in chancery, where the court had power to determine questions of fact as well as law, and, therefore, might find the fraud from the evidence, when, in a court of law, the finding of a jury would be essential.

It will be observed, also, that in none of these decisions is it held that the fraudulent intent will be conclusively presumed in all cases, however trifling the indebtedness, or inconsiderable the amount of property conveyed; but the presumption is applied to conveyances by parties "in debt" or "indebted" at the time, in general terms, which, although broad enough to embrace indebtedness of the most trifling amount, by a person of ample means, have hardly the full weight of an authority expressly to the point. See, also, 1 Story's Eq., sec. 363, n. Indeed, it might be urged very plausibly that these terms were used in the sense of indebtedness to a substantial amount, such as to cause embarrassment, or to such an extent com-

pared with the debtor's means, that the conveyance in question might reasonably be deemed to impair the security for the debts. In such cases a voluntary settlement might well be regarded as wanting in good faith, and, therefore, void; but no such charge could ordinarily be made where the indebtedness was trifling and the means retained were ample; nor do we find among the authorities cited by Chancellor Kent a case of this character. The doctrine of *Reade* v. *Livingstone* has been followed to some extent by courts in this country, and the cases are referred to in 2 Kent's Com. 441, 442, and notes.

On the other hand, the doctrine of *Reade* v. *Livingstone* has been discussed very ably by Judge Story (1 Stor. Eq., secs. 358–365, and the authorities cited and examined); and he is evidently of the opinion that, in the case of a voluntary conveyance, a mere indebtment does not *per se* render it void, even as to existing creditors; and we think that this opinion is sustained by the authorities. And Chancellor Kent (in 2 Com. 442, note a), in referring to this examination of Judge Story and the opinion suggested, says he has no doubt that this is the tendency of the decisions, both in England and America, and that the conclusions of fraud are to be left as matters of fact to a common jury. And he further says that " the doctrine in *Reade* v. *Livingstone,* and of those English chancellors on whom it rested, is, as I greatly fear, too stern for the present times."

Upon the whole, we are inclined to the opinion that a voluntary conveyance, for the consideration of natural love and affection, made by a person not embarrassed at the time, but retaining ample means to pay all his existing creditors, is good, unless it be made to appear that such conveyance was not *bonâ fide.* Whether it was *bonâ fide* or not is a question of fact depending upon all the circumstances of the case, such as the reasonableness of the provision, the extent of the indebtedness, the nature and sufficiency of the fund retained to satisfy such debts, and other circumstances bearing upon the motives of the conveyance.

It is true that, under cover of family settlements, fraud may sometimes lie concealed and creditors be greatly embarrassed; but, in the experience of courts of justice, it has not been found so generally true as to cause the establishment of a rule so stringent as to hold such settlements fraudulent in all cases, as a judgment of law, where the grantor was indebted to any amount, however trifling it might be. The case of secret trusts, by which a beneficial use is reserved to the grantor, stands upon a footing entirely different, inasmuch as such trusts are entirely inconsistent with the apparent object of the sale, are rarely resorted to for an honest purpose, and are never necessary. Whereas, provisions of the character under consideration are not only free from all these objections, but when, not trenching upon the security of creditors, are in accordance with a high moral duty to provide for the advancement of those to whom the party is bound by the ties of blood and affection. The rule suggested by Chancellor Kent would be in the nature of a lien upon all the property, both real and personal, of a debtor, as against

any one who might acquire any of it without a valuable consideration, whether in the shape of advancement in business to a son, or a provision for a daughter on her marriage, and without regard to the fact whether he did or did not retain ample means to pay his debts. This doctrine, we think, is against the weight of authority, both in England and America, which leads to the conclusion that this is a matter to be weighed by the jury, with the other circumstances of the case, upon the question of good faith, and does not, *per se*, afford an inference of fraud as a conclusion of law.

Among numerous English cases that sustain the views we have expressed, are *Russell* v. *Hammond*, 1 Atk. 15; *Cadogan* v. *Kennett*, Cowp. 432, where Lord Mansfield holds that a fair voluntary conveyance may be good against creditors; that indebtedness at the time is an argument of fraud; and that the question is in any case, whether the act was *bonâ fide*, or a trick and contrivance to defeat creditors, though he says if it be to a trustee for the benefit of the debtor it is fraudulent. So is *Doe* v. *Routledge*, Cowp. 705. To render fraudulent and void a voluntary settlement by reason of indebtedness, it was held, in *Lush* v. *Wilkinson*, 5 Ves. (1 Sum. Ed.) 384, that such indebtedness must be to the extent of insolvency; and the same general doctrine is recognized in *Shears* v. *Rogers*, 3 B. & A. 362, where it was held that, if the conveyance left in the debtor's hands not enough to pay his debts, it was fraudulent and void. *Gale* v. *Williamson*, 8 M. & W. 405, is also an authority in point. See, also, 1 Story's Eq., sec. 363, note 1, and cases cited; *James* v. *Boulter*, 1 Cox 288. In *Stephens* v. *Olive*, 2 Bro. Ch. 90, it was held that a conveyance to trustees by the husband on separation from the wife, the trustees indemnifying the husband against the future debts of the wife, was for a valuable consideration, and not within the statute of 13 Elizabeth, there being no evidence of any indebtedness of the husband, except one debt of £500, which was secured by a mortgage. This shows that the evidence of fraud may be repelled by proving the indebtedness to have been secured; and whether such security was specific as by mortgage, or general and founded upon ample means retained by the grantor, would seem, in this respect, to make no difference. The case of *Townshend* v. *Westacott*, 2 Beav. 340, 341, cited in 1 Story's Eq., sec. 362, a, is strongly in point.

In accordance with our views the American cases are numerous. Among them are *Seward* v. *Jackson*, 8 Cow. 406–438, in opinion of Allen, Senator, and cases cited. In *Van Wyck* v. *Seward*, 6 Paige Ch. 62, it is held that, when a parent makes an advancement to his child, and honestly and fairly retains sufficient to pay his debts, such child is not bound to refund such advancement, even if it should happen that existing debts were not paid; and other cases in New-York sustain these views. In *Salmon* v. *Bennett*, 1 Conn. 525, it is decided by *Swift*, C. J., that, where there is no actual fraudulent intent, and a voluntary conveyance is made to a child, in consideration of love and affection, if the grantor is in prosperous circumstances, unembarrassed, and not considerably indebted, and the gift is a reasonable provision for the child, according to his state and condition in life, comprehending but a small portion of his

estate, leaving ample funds unincumbered for the payment of the grantor's debts, then such conveyance will be valid against existing creditors; and *Gould,* J., holds that the indebtedness, to defeat the conveyance, must amount or approximate to embarrassment; and so in *Jackson* v. *Town,* 4 Cow. 599, and *Verplank* v. *Strong,* 12 Johns. 536. In *Hinde's Lessee* v. *Longworth,* 11 Wheat. 199, it is decided that the mere fact of indebtedness to a small amount, the grantor being in prosperous circumstances, and the gift a reasonable provision for the child, will not render the deed fraudulent. And similar views are held by *Marshall,* C. J., in *Hopkins* v. *Randolph,* 2 Brock. 132, and cases cited in note, and in *Lush* v. *Wilkinson,* 5 Ves. (Sum. Ed.) 387. The rule is the same in Vermont and Pennsylvania. *Brackett* v. *Waite,* 4 Vt. 389; *Brackett* v. *Waite,* 6 Vt. 411, where the cases are collected. *Chambers* v. *Spencer,* 5 Watts 404; *Porter* v. *Porter,* 4 Whart. 27. Other cases are collected, to the same point, in 2 Kent's Com. (9th Ed.) 580, note a. In *Parkman* v. *Welch,* 19 Pick. 231, it is held to be sufficient to impeach a voluntary conveyance, to show that the grantor was deeply indebted. See, also, *Bennett* v. *Bedford Bank,* 11 Mass. 481; *Parker* v. *Proctor,* 9 Mass. 390; *Usher* v. *Hazeltine,* 5 Greenl. 471.

In our own State it is laid down by *Richardson,* C. J., in *Smith* v. *Lowell,* 6 N. H. 69, that a parent may, if not in embarrassed circumstances, make a suitable provision for a child, which will be sustained against creditors. But in *Smith* v. *Smith,* 11 N. H. 459, *Parker,* C. J., leaves the point undecided. In *Carlisle* v. *Rich,* 8 N. H. 44, it is laid down in general terms, that a voluntary conveyance by a person in debt is fraudulent, as a conclusion of law, and the court consider but do not pass upon the effect of sufficient means being retained to pay all the existing debts, assuming that, in fact, the debtor was insolvent.

It would seem, then, that the question has not been fully settled in this State; but we are satisfied that the conclusion we have reached is the right one, both on principle and authority.

As part of the *res gestæ,* and as bearing upon the question how said Hannah understood her residence in the plaintiff's family, and to show want of good faith in assenting at the time to the account, witnesses were permitted to testify that, when she was about to start for New-York, she said she was going to visit her sister Lucy and friends, and on her return said she had a good visit and an agreeable time. And it appeared that her sister was the mother of the plaintiff's wife, and resided in his family.

One ground taken by the defendant was, that the plaintiff's claim was fictitious, and the assent of Hannah Dow collusive and by a fraudulent concert with the plaintiff, for the mere purpose of enabling him to assume the character of a creditor, and take this property from the defendant. Such a proceeding would not, however, place the plaintiff before the court in the character of a creditor, nor does the plaintiff's counsel claim that it would. It was, therefore, material to show that the assent of said Hannah was collusive, otherwise it might have had great weight in determining whether the plaintiff's claim was or was not valid.

To prove that both the plaintiff and Hannah Dow, at the time of the date of the several charges, understood that no such claim existed, would be clearly admissible on the question of fraud, and, as in cases of fraudulent conveyance, the understanding and intent of each may be proved by separate and independent evidence. *Foster* v. *Hall*, 12 Pick. 89. In what way, then, may this understanding be proved? The obvious answer is, that it may be proved by the declarations of the parties, for ordinarily there would be no other way. And it can not be material that the declarations should have been made in the presence of the other party, any more than in the case of a fraudulent conveyance. The purpose here was to prove a fraudulent intent in the agreement that the claim was valid, by showing that the parties really understood it to be otherwise. With these views and for this purpose, we think the evidence was competent; but it could have no legitimate tendency to disprove the claim, but only to rebut the evidence of the admission.

We do not think this case stands like *Page* v. *Parker*, as to admissions of co-conspirators, but stands like the case of a fraudulent conveyance. In the case of a fraudulent conveyance, it is competent to show that about the same time the vendor made other conveyances of a like character. *Whitney* v. *Varney*, 10 N. H. 291; *Blake* v. *White*, 13 N. H. 267. In the latter case, to prove the fraudulent intent of the vendor, proof of other fraudulent sales about the same time, and of proposals to make others, together with his statements and declarations showing such intent, were held to be competent, and so were his declarations in respect to the property while in his possession, after the alleged sale. In *Bridge* v. *Eggleston*, 14 Mass. 244, it was held that the conduct and declarations of a grantor, tending to show a fraudulent intent, and made before the conveyance, but not after, are admissible; and in this case they were nearly six months before. So is *Foster* v. *Hall*, before cited. So where the plaintiff, in replevin against a sheriff who had attached a horse as the property of one who had bought it of the plaintiff, sought to avoid the sale upon the ground that it was obtained by false pretenses, it was held that proof of other purchases about the same time, under similar pretenses, was admissible, as having some tendency to show a fraudulent intent in the case under consideration. *Bradley* v. *Obear*, 10 N. H. 477. These cases show that when the motives and intent of the parties to an act become material, they may be shown by their separate and independent acts and declarations, accompanying or preceding the act in question. How far back such proof may extend, must depend upon the nature and circumstances of the particular case, and no positive rule can be laid down. In the case of fraudulent conveyances and goods obtained by false pretenses, the proof will be limited to similar acts about the same time.

In this case the inquiry is, whether the claim in question was agreed to because it was just, or in pursuance of a fraudulent purpose to take the property from the defendant. The acts and declarations of the parties in respect to the claim, from its origin to the time of the act in question, whether it had been pressed on the one

side, or denied on the other, or, in short, whether it had or had not been treated as a valid claim, was, we think, a material inquiry, as bearing upon the intent of the admission. Any previous declarations, therefore, by the said Hannah, tending to show that, at the time of the admission in question, she did not, in truth, understand the claim to be just, would bear rightfully upon the question of fraud.

The plaintiff also objects to the admission of the testimony of Russell Kimball, to the effect that, after the judgment in favor of the plaintiff against the said Hannah—but whether before or after the extent is uncertain—she told him that she was to have the use of the property in question during her life. If this was after the extent, and while the said Hannah was in possession with the assent of the plaintiff, it would be competent for the purpose of showing the nature of her possession; and if the jury were satisfied that she continued to possess the land under such a claim of right, it would bear rightfully upon the validity of the debt, as understood by the parties. This accords distinctly with the view of the court in *Blake* v. *White*, before cited. For aught that appears, the jury might have found the statement to Kimball to have been after the extent, and we are, in the absence of exceptions, to presume the instruction to the jury to have been correct.

Another question arises upon the testimony of Mrs. Lucy Elliott, whose deposition was read by the plaintiff. On her direct examination by the plaintiff, she testified to the fact of said Hannah being at the plaintiff's house at the times for which board was charged, and on the cross-examination she stated that, on the death of her husband, Mr. Elliott, in 1839, she went to New-York, staid part of the time in the plaintiff's family, and then went to Haverhill and stopped with her mother and sister Hannah, until her mother died, and then staid with her sister, and, in all, was there about three years, and was charged nothing for her board. She further stated that, since she went to New-York, she had been a member of the plaintiff's family, and no charges made against her. She also stated that she had United States stocks to the amount of $1250, and about $1500 of other property, and that, on the death of Hannah Dow, she received her United States stock; and all this she had given to the plaintiff. It appeared from the testimony of the plaintiff and other sources, that, on the death of Mr. Elliott, in 1839, the plaintiff offered Mrs. Elliott his house as her home, as long as she chose to make it so; but it did not appear that he was under any obligation to support her, beyond what his aforesaid offer to her, his relationship, and receipt of all her property would impose. The plaintiff objected to the aforesaid statements of Mrs. Elliott on the cross-examination, but they were admitted by the court, and, we are inclined to think, rightfully, as showing the sort of connection that existed between his family and the said Hannah, as bearing upon the question whether the parties did or did not understand that the said Hannah was to pay for her board. It stands upon the same footing, in fact, as the proof that the said Hannah was the aunt of the plaintiff's wife, which the jury might

properly consider. It is true that the plaintiff was not bound to support Mrs. Elliott, but he had offered her a home, received all her property, and it was for the jury to weigh the fact that she had been a long time in said Hannah's family without charge, in determining whether it would be expected that the plaintiff should charge for the board of said Hannah. And especially would it be admissible, on the point of her understanding of the matter at the time she assented to the claim. If the validity of the claim was established, of course the evidence in question would be no answer; but whether any such claim ever existed was in controversy, and this testimony might properly be weighed.

The testimony that the plaintiff's wife was the only heir of Mrs. Lucy Elliott, and that the latter was a legatee under the will of the said Hannah, was admissible upon the same grounds as the preceding, namely, to show in what connection the plaintiff and Hannah Dow stood.

The statement by Lucy Elliott, on cross-examination, that she supposed the plaintiff was displeased on account of the deed to Hazeltine, is immaterial, and ought not to disturb the verdict. Beside, it does not appear to have been objected to as an opinion merely, and the language may have been used and understood as if she had said, "I think he was displeased."

The objection to the proof that said Hannah was nervous and excitable and easily wrought upon, does not state upon what ground it was put; but, assuming that the mode of proof was not objectionable, the question is, was the fact itself competent? When an attempt is made to set aside a deed or other contract, upon the ground that it was obtained by fraud, it is not unusual to grant relief upon the ground of fraud and undue influence practiced upon the weakness and infirmity of others; and we see no objection, in cases of this sort, to the proof here admitted, especially in connection with the character of the postcript written by her, indicating an agitated and incoherent state of mind. Chit. Cont. 594, and cases cited; 1 Story's Eq., sec. 235–238, and notes. So in *Brackett* v. *Waite*, 6 Vt. 411, it was held competent to show that a person was in poor health and subject to depression of spirits, to qualify his statements as to his property.

This disposes of all the exceptions taken, and there must be, therefore,

                                        *Judgment on the verdict.*