Van Wyck v. Seward.

---

[375]. VAN WYCK, *appellant*, and SEWARD and others, *respondents*.

Where a party, after having assigned a judgment and guaranteed the payment thereof, made a conveyance of his real estate to his son, which the assignee of the judgment sought to set aside in chancery as *voluntary*; and the chancellor made a decree refusing to set aside the conveyance, for the reasons, that the assignee had become the purchaser at public vendue of

the property upon which the judgment was a lien, and that had the same been sold at its fair cash value, it would have been *sufficient to satisfy the judgment*; and also that the grantor, at the time of the execution of the conveyance, *did not divest himself of the means of paying any probable loss* which might accrue upon the assigned judgment, *holding*, that although the complainant had a *technical right* to retain the property bid in by him, and to hold the assignee liable for the deficiency. he was not, under the circumstances of the case, entitled to the aid of the court of chancery ; the court for the correction of errors, on appeal, *affirmed the decree*—15 members of the court voting for the affirmance, and 14 for reversal.

A party bound by a *contract*, in virtue whereof he may become liable to the payment of money, *although his liability be contingent*, is a *debtor* within the meaning of the statute avoiding all gifts, &c., made to *delay, hinder, or defraud creditors.*

Whether the doctrine, " that fraud is an inference or presumption of law in respect to *voluntary conveyances* in reference to *prior debts*," has been affected by the decision of the case of *Jackson* v. *Seward*, (8 *Cowen*, 429,) in the court for the correction of errors, *quere.*

The question whether a parent, *who is a debtor at the time*, can make a voluntary settlement of his property in the nature of a testamentary disposition, *which ultimately works injustice to his creditors*, and the cases holding the negative of the question, and those in which exceptions have been allowed, cited, considered, and discussed.

The *intent to defraud* need not be established by direct proof; in this, as in other cases where the *intention* with which an act is done is to be ascertained, it may be *inferred* or *presumed*, from the knowledge of other facts

APPEAL from chancery. The appellant filed a bill in chancery to set aside a conveyance alleged by him to be *voluntary*. The cause was heard before the vice-chancellor of the first circuit, who dismissed the bill with costs ; which decision was affirmed by the chancellor. The complainant below, thereupon appealed to this court. The facts of the case will be seen in the opinion delivered by Mr. Justice Bronson. (See also 1 *Edwards' Ch. R.* 327 ; 5 *Cowen's R.* 67, and 8 *id.* 406.) The opinion of the chancellor, affirming the decision of [376] the vice-chancellor, will be found in 6 *Paige*, 64, et seq.

The case was argued here by

*S. Beardsley* (attorney-general) & *S. Sherwood*, for the appellant.

*D. B. Ogden* & *J. Tallmadge*, for the respondent.

After advisement, the following opinions were delivered :

By Justice BRONSON. The parties are agreed in relation to the most material facts of this case, which will be found to lie within a narrow compass. In November, 1817, *William Seward* contracted an obligation to the appellant, on which his responsibility, as subsequently ascertained by the judgment, amounted to nearly $3000. Seward at this time owned a farm worth, according to the estimate of General *Brush*, the only witness on that subject, about $11,000, and personal property worth about $1000, besides two bonds amounting to a fraction over $2900 ; and owed no debt, save his obligation to the appellant. About five months after making the covenant with the appellant, Seward gave all his estate, real and personal, to his children, except the two bonds. One of the bonds he afterwards gave to his son *Philander*—what became of the other, does not appear. About four years after the gift, Seward died, totally destitute of property. The appellant had, in the mean time, recovered his judgment, issued execution, and become the purchaser of the farm, for the sum of $2500. He has obtained no actual satisfaction of the judgment, or of any part of it. The question to be decided is, which of these parties has the better legal right. Shall the appellant be paid his debt, or shall the defendants enjoy the gift, while the creditor of the donor loses his demand ? For the honor of the law, I trust there can be no great diversity of opinion on such a question. If the defendants are entitled to the decree which has been made in their favor, it must either be on the ground that there is some controlling fact beyond the outline which has been drawn, or because our jurisprudence comes lamentably short of [377] attaining the ends of substantial justice.

Before examining the questions which legitimately belong to this controversy, it may be proper to notice some others which have been urged upon our consideration. While it is the privilege of counsel to present the cause of their

Van Wyck v. Seward.

client in its best aspect, it is the business of the court to discriminate between truth and error, and to take care that it is not drawn aside and bewildered either by facts or arguments which are foreign to the true point of controversy.

I. The answer of the defendants, which is in several respects a document of a very peculiar character, sets up the trial and verdict in an action of ejectment between some of these parties as a conclusive bar to the present suit. (*See Jackson* v. *Seward,* 5 Cowen, 67; *S. C. in error,* 8 Cowen, 406.) Although this objection is not among the printed points made on the part of the respondents, and although the ground was distinctly abandoned by their leading counsel, it was nevertheless insisted on by the counsel who followed, and it is therefore proper to see how much the argument is worth. It is no doubt a general rule that the verdict of a jury in a matter directly litigated, where a judgment has followed the verdict, is a conclusive estoppel as between the same parties and those claiming under them, and they will not again be allowed to controvert the same matter. But it is equally clear that the action of ejectment, previous to the late revision of the laws, formed an exception to the rule, and that the verdict of a jury, either the one way or the other, was no impediment in the way of a further trial between the same parties. The only restraint against an unlimited number of successive actions of ejectment to try the same right, was an injunction from the court of chancery. This doctrine is so familiar to every lawyer, that I should not have thought it necessary to notice the question in this place, had it not been pressed upon our consideration with much apparent zeal and confidence.

There is another very satisfactory answer to this objection. The judgment which followed the verdict has been reversed, and a verdict without a [378] judgment is not an estoppel, in whatever action it may have been rendered.

Although the verdict is a matter of no legal importance in this controversy, yet the moral influence of what twelve men upon their oaths have said—the decision of a jury that there was no fraud—was strongly urged upon our consideration. If we are at liberty to follow the argument, it will be found that the supposed verdict is entitled to no more weight on the score of moral influence, than it is by the law of the land. There has, in fact, never been any verdict— no twelve men have ever said that this transaction was not fraudulent as against the appellant. When the parties had given their evidence, they voluntarily withdrew the cause from the consideration of the jury, and prepared a case for the opinion of the supreme court, containing such facts and conclusions as they thought proper. That case was afterwards turned into a special verdict, appearing, as the forms of law necessarily required, to have been found by a jury, although in truth no verdict had ever been rendered. We may then safely lay this supposed finding of twelve men upon their oaths, entirely out of the case, both in its legal and its moral influences, and wait some more fitting occasion to vindicate the right of trial by jury.

II. I shall here notice another matter set up in the answer. The defendants insist that the northern and Oneida county lands, which were sold under the judgment against William Seward, jun., and purchased by the appellant, were of sufficient value to satisfy the judgment; and consequently that the appellant ought not to have recovered against William Seward on his covenant. Although this matter has not been deemed worthy of a place among the printed points of the respondents, it is put forth in the answer as one of the most important grounds of defence, and was much relied on by one of the counsel on the argument. Proofs have been taken, for the purpose of showing the value of the farm which William Seward, jun., conveyed to the appellant, and the value of the lands and other property which the appellant gave as a part of the price.

And it is said, on the one hand, that as the appellant has got back the [379] northern and Oneida county lands, that he has on the whole lost nothing

Van Wyck v. Seward.

in this matter; while on the other hand it is said, that independent of the northern and Oneida county lands, the appellant paid William Seward, jun., all that his farm was worth—that unless he is paid the judgment recovered against William Seward on the covenant, he will on the whole be a loser to that or a greater amount. If we are at liberty to go into these collateral questions, and the inquiry was, whether the appellant has made or lost money by his dealings with William Seward, jun., it would appear most conclusively on the proofs, that after the judgment against the father shall have been paid, the appellant will still be a loser to nearly or quite the whole amount of his own judgment against William Seward, jun.

But there is no principle upon which we can go back and inquire into the merits of the appellant's claim upon William Seward. That question has been settled by the judgment on his covenant. The appellant has asserted his right in the forms prescribed by law. William Seward has made his defence, or had the full opportunity of doing so, and nothing can be more clear than that this matter cannot be overhauled in any collateral proceeding. If there was any fraud or improper conduct on the part of the appellant, in the sale of the northern or Oneida lands under the judgment assigned to him—if, through concealment or any other fault on his part, the lands were sold below their value—that was matter of defence to the action on the covenant, and whether it was set up or not, the judgment is absolutely conclusive upon the rights of the parties. That William Seward made the best defence in his power, is evident from the fact that the action was pending more than a year. Indeed, it is not pretended by the answer, that the matter was not fully litigated. But if the fact were otherwise, the judgment would be equally conclusive. There would never be an end of litigation, if a party, when sued, could remain silent, and then set up, after judgment, that he had a good defence. If Seward could not defend himself at law, and there was anything against equity in the appellant's proceedings, he should then have resorted to another forum for relief. That, perhaps, he might have done after a recovery at law; but it would be a direct proceeding [380] to set aside the judgment, or to enjoin the party against attempting to enforce it, and not an effort to try the matter over again in a collateral action. It may be that the respondents, although they are in some sense strangers to the judgment, might have filed a bill in equity to restrain the appellant from enforcing it at law. If there was anything wrong on the part of the appellant, that was their only remedy. Neither they nor any one else can impeach the judgment, except by bringing error at law to reverse it, or proceeding by bill in equity to restrain the plaintiff from using it. Any other rule would be utterly subversive of the ordinary course of justice.

Let us examine this question a little further. The appellant filed his bill in the court below, alleging, among other things, that he had recovered a judgment against Seward on his covenant, and that certain rights had accrued to him in consequence of the recovery. What is the answer? The defendants say, true, you sued Seward on his covenant and recovered a judgment, but you ought not to have recovered—you had no cause of action. I hazard little in saying that such an answer as this to a judgment was never before attempted, either at law or in equity. If allowed to have a shadow of influence upon our decision, the most pernicious consequences must follow. If it be a good answer here, it will be a good answer in any other form of action. Had the personal property of Seward been taken under the judgment and he had brought trespass, the appellant would have pleaded the recovery as his justification. What answer would it have been on the part of Seward to say: true, you recovered a judgment, but the recovery was against equity and good conscience—I had a defence? Or, had Seward been taken in execution and then sued for false imprisonment, would he be able to maintain his action by alleging that the judgment ought not to have been rendered? These cases are precisely parallel to the one under consideration. The

Van Wyck v. Seward.

appellant claims the benefit of his judgment, and so long as it remains in force and there is no direct proceeding to avoid it, neither this nor any other [381] court has the right to inquire into the merits of the original cause of action.

It is said that a party who seeks equity must come into court with clean hands. This, like other maxims, is well enough when properly applied. If a party seeks equitable relief in relation to a particular transaction, he must be willing in that matter to do, as well as to receive equity. But the rule was never carried far enough to reach this case. If there was anything wrong on the part of the appellant in relation to the sales under the executions against William Seward, jun., the stain was removed when he asserted his right on the covenant in the forms prescribed by law, and the proper tribunal pronounced a judgment in his favor. The defendants cannot go back beyond a recovery.

If this were a direct proceeding to avoid the judgment, there would be no great difficulty in the case. The defendants have not very distinctly alleged that there was any fraud on the part of the appellant in obtaining it, or that there was any sufficient reason why he should not have recovered; but if fraud had been plainly alleged, this part of the answer was not responsive to the bill. A replication has been filed, and the burden lay on the defendants of making out their case. There is no pretense that the land was not properly advertised, that the sales were improperly conducted, or that the property was not sold to the best bidder. The only evidence touching this question is that of Mrs. Seward, who was over eighty-two years old when she was examined, and said her memory was poor. She says her husband asked Gen. Van Wyck, one evening, *when* the lands were to be sold; Van Wyck said he did not know, but would let him know, so that he might go or send. A short time after, they heard that the lands had been sold; her husband would not believe it, because Van Wyck had promised to let them know. This is all she says on the subject, except some further conversation with her husband, which cannot be evidence against the appellant. Now, for aught that appears, Van Wyck did inform Seward when the lands were to be sold. He did all that he promised to do. Such evidence as this would furnish no ground for avoiding the judgment, had a direct proceeding for that purpose been attempted. [382] That Van Wyck bought the lands for less than their real value, clearly cannot be a matter of any moment. He was the best bidder. All that he paid over the price offered by others was a favor conferred on Seward—not a cause of complaint.

But I repeat, that we can, upon no legal principle, go back of the judgment, for the purpose of inquiring into the sufficiency of the cause of action upon which it was recovered. We cannot do so without unsettling the whole doctrine that a judgment, so long as it remains in force, is conclusive upon parties and privies. No authority or dictum has been referred to in support of the doctrine that the judgment may be impeached in this collateral action, and none, I think, can be found. We are asked to make a precedent which will render the judgment or decree of a court of competent jurisdiction upon a matter directly in issue, of as little force as a stated account between two merchants. We are asked to unsettle the whole course of legal adjudication upon questions of this character, and hold that the parties may litigate the same matter as often as their interest or their passions may prompt to such a course. The rights of the parties now before the court are of little moment, when compared with the consequences which may follow from sanctioning such a doctrine. A principle established in this case by the highest judicial forum in the state, must stand as a precedent for all other cases in this and every subordinate tribunal. The errors of inferior courts may be corrected here, but if *we* depart from the law, the error is fatal.

There are other matters in this answer which might very well have been left out of it, but I shall not stop to give them a separate consideration. If we lay out of the case, as I think we are bound to do, everything which relates to the supposed verdict of a jury, and all the allegations and proofs relating to the

Van Wyck v. Seward.

merits of the original cause of action on the covenant of William Seward, the only legitimate ground of controversy between the parties will be found to lie within a narrow compass. If the appellant was a creditor of William Seward, within the meaning of the statute, at the time the deed was executed to Philander—if that was a voluntary conveyance, or in other words, a mere gift of the land from the father to his three children who are made defend- [383] ants, it is then, I think, quite clear that the deed was fraudulent and void as against the appellant, and must be set aside. If the conveyance was not wholly voluntary, but there was some valuable consideration, the question may then arise whether the deed can be upheld as against the creditor for anything more than the consideration actually paid.

III. Was the appellant entitled to the protection of the statute, as a creditor of William Seward? The covenant of Seward was executed five months before the giving of the deed, though the cause of action did not accrue until afterwards. The statute avoids all gifts, grants, alienations. &c., made to delay, hinder, or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, and demands. (1 *R. L.* 75, § 2.) In *Jackson* v. *Seward*, (5 *Cowen*, 67,) the facts were the same in relation to this question as they are in the case under consideration. The court entertained no doubt that the plaintiff was entitled to the protection of the statute, although there was nothing but a contingent liability on the part of Seward at the time he made the gift. When the case came before this court, (8 *Cowen*, 429,) Senator *Spencer* declared himself satisfied with the reasoning of *Sutherland*, J., and although he was for reversing the judgment on another ground, he was of opinion that Van Wyck was a creditor at the time of the conveyance. Senator *Stebbins* was the only member of the court who expressed a doubt on the question, although elaborate opinions were delivered by Chancellor *Jones* and Senator *Allen*. As neither the chancellor nor the vice-chancellor has suggested a doubt on the point, I think it should be regarded as a settled question in this state : but I will refer to a few cases in addition to those mentioned by *Sutherland*, J., in *Jackson* v. *Seward*.

In *Jackson* v. *Myers*, (18 *Johns. R.* 425,) the court held that our statute was broad enough to protect persons claiming damages for a tort. In *Fox* v. *Hills*, (1 *Conn. R.* 295,) it was decided that a voluntary conveyance by a father to his son, made to defeat the claim of the plaintiff to damages for a tort, [384] was void at the common law; and four of the judges were of opinion that it was also void within the Connecticut statute against fraudulent conveyances, although the language of that act is not so broad as the 13 *Eliz. ch.* 5, which we have copied. (See also *Salmon* v. *Bennett*, 1 *Conn. R.* 525.) In *Lewkner* v. *Freeman*, (*Prec. in Ch.* 105, reported also in 1 *Eq. Cas. Abr.* 148, 9,) the plaintiff brought an action of *crim. con.* against Montague, who afterwards conveyed his lands to trustees to pay his debts. The plaintiff recovered £5000, and then brought his bill to be relieved against the deed as being fraudulent. The court said, what was strictly true, that the plaintiff was not a creditor at the making of the deed ; but the decision was put upon the ground that Montague had a right to give a preference among his creditors, and it was said to be conscientious in him to prefer his real creditors to this demand, which was only founded in *maleficio*. But the court allowed the plaintiff to come in on the surplus after payment of the debts provided for by the deed, and thus affirmed the principle of the other cases which have been mentioned.

These decisions have given a more liberal construction to the statute against fraudulent gifts and conveyances than will be necessary for the protection of the appellant. His claim arose upon contract, and he was clearly a creditor within the meaning of the statute. In the *E. I. Company* v. *Clavel*, (*Prec. in Ch.* 377,) Sir Ed. Littleton, on being appointed by the plaintiffs to go as president to the Bay of Bengal and manage the affairs of the company, by articles dated 16th January,

Van Wyck *v.* Seward.

1798, covenanted for the faithful discharge of his duty, and also executed a bond with sureties in the penalty of £2000, conditioned for the performance of the articles. A few days afterwards he made a settlement on his daughter, and sailed for the East Indies. The defendant Clavel married the daughter, and Sir Ed. Littleton having subsequently embezzled the effects of the company to a large amount, a question arose between the company and the husband in relation to the property settled on the wife. The chancellor said: " the *articles* do not bind the real estate at all, but the *bond* only so far as the penalty goes," and he [385] directed an account and that the company should be paid the £2000. So far as relates to the bond, this seems to be a direct adjudication, that one bound by a *contract*, although his liability is contingent, and no cause of action may ever arise, is nevertheless a debtor within the meaning of the statute. Upon what principle the chancellor distinguished between the bond and the covenant in the articles, I am wholly unable to determine. The contract was precisely the same in both, with the single exception that the amount which could be recovered was in one case bounded by a penalty, while in the other it was without limitation. I agree with Chief Justice Marshall, (2 *Brock.* 147,) that there is some difficulty in ascertaining the principle of this case, and I have only referred to it because it was supposed to have a bearing in favor of the defendant.

This question was very fully considered in *How* v. *Ward*, (4 *Greenl.* 195,) where it was held that the relation of debtor and creditor existed, although there was no express, but only an implied contract between the parties, and although the liability of the person who executed the conveyance depended on a double contingency. Ward and Waterhouse became sureties to the sheriff for March, who was appointed a deputy. Waterhouse then conveyed his land to the plaintiff. The sureties were afterwards sued by the sheriff, who recovered a judgment against them, which was paid by Ward. The question was, whether Ward, at the date of the deed, was such a creditor of Waterhouse, his co-surety, as would authorize him to impeach the conveyance on the ground of fraud, and the court decided the point in his favor. It will be seen that the liability of Waterhouse to Ward, his co-surety, depended on a double contingency. It was, in the first place, uncertain whether they would ever become liable to pay anything to the sheriff for the misconduct of the deputy, their principal; and should they become answerable for any default of his, it was uncertain whether Ward would pay more than his just proportion, and thus acquire the right of calling on Waterhouse for contribution; and yet the court held that Ward was a [386] creditor of his co-surety within the meaning of the statute, from the moment that they became obligors in the bond of the sheriff. The reasoning of Chief Justice Mellen on the question is, I think, conclusive.

The objection is, that Van Wyck was not a creditor of Seward at the date of the deed, because it was then uncertain whether he would ever have a cause of action on the covenant. Let us see where this doctrine would carry us. If one promise to pay money at a future day, he may pay before the credit expires; and until that time arrives, it is uncertain whether an action will ever accrue on the promise. The contract of a surety only creates a contingent liability. Until the principal is in default, it is uncertain whether an action will ever accrue against the surety. The drawer of a bill of exchange is only bound to pay it upon a contingency which may never happen; and so it is with the endorser of negotiable paper of all kinds. The contract of indemnity is another case where an action may never accrue upon the undertaking. In these, and all other cases depending upon contract, the person to whom the engagement is made is as much a creditor, within the meaning of the statute, as though he had a debt on which a right of action already existed. There is no reason why he should not be entitled to the same protection in the one case as in the other. In the language of Chief Justice Mellen, in *How* v. *Ward*, " although he cannot maintain an action on the contract until it has been violated, still he has an in-

Van Wyck v. Seward.

terest in the property conveyed, as a fund out of which the debt ought to be paid."

IV. Was this a voluntary conveyance—a mere gift of the property by Seward to his children; or was it a sale of the farm to Philander for a valuable consideration? I can discover no foundation in the case for calling this a sale of the property. The parties never thought of such a thing as a contract of buying and selling at the time the conveyance was executed. It was in truth a mere gift of the property from the father to his son Philander, and his two daughters Rebecca and Electa. The mode of making the gift was by conveying the whole of the property to Philander, and then requiring him to pay the daughters such an amount as the father chose to regard as their portion of his [387] estate. It is, in substance, the same thing as though the deed had been made to the three children, declaring in it the extent of their respective interest in the property. Each of the daughters received a gratuity equal to the amount of her bond; and the residue of the property was given to Philander. It is impossible to make anything else of the transaction, without shutting our eyes against the plain, honest truth of the case.

It was in the nature of a testamentary disposition of the property. This was distinctly avowed by Seward to his wife and his counsel, Judge Emott, and no one ever thought of calling it by any other name than a gift, until this controversy arose. Mrs. Seward, the widow, testifies that it was always her husband's determination to settle his estate in his lifetime, and not leave it to be settled after his death. She says further, that her husband, more than a dozen years before his death, expressed his determination to settle his property among his children. He said he would give the farm to Philander, and that Philander must pay off his two sisters, who had not had their portions. When he went to consult Judge Emott, he said he was old and infirm, and wished to make some disposition and settlement of his property among his family, and asked advice as to the manner of doing it. Judge Emott advised a will. Seward objected to that, because wills often led to family disputes and difficulties, and he thought it best to settle his property among his children while he was living. After the deed was executed, he told Judge Emott that he had made a disposition of his property in his family in the manner before talked of between them. It was avowedly a gift—a settlement of the estate upon his family. It was in the nature of a testamentary disposition. This mode was adopted instead of making a will, because he thought it less likely to lead to family disputes and difficulties.

It is evident, from all the other facts, as well as from the express declaration of Seward, that this mode was adopted as a substitute for a will. The bonds to the daughters were not made payable until after his death, and then without interest. And again, as the deed would convey a present estate in the [388] land to Philander, and he would immediately be entitled to the rents and profits, he was required to pay his father a sum annually for life, about equal in amount to the yearly rents and profits of the farm. The defendants say, in their answer, that $400 would have been a reasonable rent for the farm; but they gave no proof on the subject. It was an improved farm in the county of Dutchess, worth, according to the testimony of Gen. Brush, the only witness on that question, about $11,000. In the absence of all proof to the contrary, I think we may safely estimate the annual value of such a farm at $500, the amount of the annuity to be paid by Philander during the life of his father. It is evident, then, from the acts, as well as the declaration of Seward, that he adopted this mode of settling his estate upon his children as a substitute for a will; and the settlement was so arranged, that it took effect substantially like a will. The only difference between the two modes was, that Philander took the rents and profits during the four years that his father lived, for which he paid rent in the form of an annuity.

If I am wrong in supposing the annuity was in the nature of a return for the use of the land the defendants will still have to encounter an insuperable diffi-

Van Wyck v. Seward.

culty. It was a conveyance which placed the property beyond the reach of cred itors, upon a trust for the benefit of the grantor and his family. In *Mackie* v. *Cairns*, (5 *Cowen*, 547,) there was an assignment to pay debts, with a reservation of $2000 per year, for a period not exceeding four years, to be paid for the support of the grantor and his family. It was decided by this court that the deed was utterly void. Chief Justice Savage said, in reference to this reservation, " It offends the moral sense ; it shocks the conscience, and produces an exclamation. It is directly against the statute, and cannot stand before it." In *Jackson* v. *Parker*, (9 *Cowen*, 73,) a conveyance was made by an intemperate father to his son, on the consideration that his son should support the family, and he had done so. But the deed was held void as against creditors. The chief [389] justice said it was unnecessary to impugn the motives of the defendant. If the object was purely to support his mother and the family, and that it was to be done by means of his father's property, which his creditors had a right to have appropriated to the payment of his debts, then the assignment was fraudulent in law. This is no new doctrine. It is a part of that legal morality, which teaches that we should discharge our obligations to others before we enrich ourselves ; that our creditors have the first claim upon our property, and that we should be just before we are generous.

If Seward had followed the advice of his counsel and made a will, instead of administering upon his own estate, we should not have heard of this controversy. The defendants would then have taken the property subject to the claims of creditors, and the appellant's judgment would have been paid.

There is another ground on which the defendants have labored to make out that there was some valuable consideration for this conveyance. Philander became twenty-one years of age nearly six years before the deed was given, and it is said that one object of the conveyance was to compensate him for his services during those six years. Indeed, Philander seems to suppose that he was entitled to be paid for his services "from his early youth upwards." I doubt not that children who live at home, sometimes entertain the opinion that they are of great importance, in a pecuniary point of view, to their parents ; that the provision which is made for all their wants is but a scanty return for the valu able services they render. But parents understand this matter much better. If they were influenced by no higher motive than the love of money, children would find themselves at liberty, not only in "early youth" but in after years, to make the best they could of the world for themselves. As a question of mere pecuniary interest, parents could very well dispense with the services of their children, if they were at the same time discharged from the burden of their maintenance and education.

Passing over the minority of Philander, let us inquire what legal claims [390] he had upon his father for the next six years. I do not inquire about his expectations from his father's bounty, but concerning his legal rights. Did his father owe him a debt for his services? There is not a shadow of foundation for such a pretense. In the first place, there is not a particle of evidence that his services were of any value to his father beyond the provision which was made for all his wants ; and if they were, there is no evidence that the services were rendered under any agreement or understanding which would make the father a debtor to his son. If we were to reverse the question, and suppose the father claiming compensation for the board, clothing, and other things furnished to his son after he attained the age of twenty-one years, there would be just as much legal evidence of the right of the father to be regarded as a creditor of his son, as there is now to say that the son was a creditor of his father. The effort to prove a legal obligation, utterly failed. Mrs. Seward, who had all the feelings of a mother in favor of upholding the deed, on the direct inquiry whether any expectation was held out to Philander to induce him to stay at home, answered that Philander had the same expectation held out to him that other

Van Wyck *v.* Seward.

children have who remain at home, and expect to have their father's property. She thinks that Philander was a little uneasy that William had got more than his part, but does not know what her husband said to Philander to make him easy. Again, she does not know that there was any understanding with Philander that he should have the farm, other than that he was the youngest son and lived at home; and it was usual that the persons so living should have the property of their parents. In addition to all this, I must once more advert to the fact, that all the conversation of Seward was about giving the property to his children: settling his estate upon them in his lifetime, instead of making a will. The idea of paying a debt, or rewarding Philander for his services, was never thought of until it became necessary to allege that there was some valuable consideration for the conveyance.

But aside from these views of the case, suppose we are at liberty to presume, without proof, that the services of Philander for six years after [391] the termination of his minority, were worth more than what he received in return; and to presume, also, that those services were rendered on a contract for a pecuniary reward: was not the one thousand dollars' worth of personal property bestowed upon him, at the time the farm was conveyed, a sufficient compensation for his services? It would have paid the hire of a faithful laborer for six years, without the addition of providing his clothes, paying his expenses, and watching over him in sickness. If Philander chooses to throw off the relation of a son, and state an account with his father on the basis of debtor and creditor, he will find a heavy balance against him, without taking into consideration the gift of the farm.

In every view which I have been able to take of the case, this was a voluntary conveyance—a mere gift of the farm from the father to his children. Facts must be distorted before we can give to the transaction any other character.

V. Was this conveyance void as against the appellant? Can the donees hold the property, and set the creditor of the donor at defiance? The question is not, whether a father can make a reasonable provision, in reference to his pecuniary circumstances, for a son when he commences business, or a daughter on her marriage; but the question is, whether a man can bestow the whole or nearly all of his estate upon his family, before he has rendered justice to those with whom he has contracted a legal obligation. Instead of reviewing at large the decisions at home and abroad on the statute of 13 *Eliz. ch.* 5, to prove that such a conveyance cannot be maintained, I will venture the assertion that no reported case can be found which will uphold it. I do not of course intend to say that others may not differ from me in relation to the facts of the case; but if I have not mistaken the nature of the transaction, there is no legal ground upon which it can be defended.

If, instead of settling the whole or nearly all of his estate upon the children, Seward had only parted with a small and inconsiderable amount of his property, retaining an ample fund within the reach of creditors for the discharge of all his legal obligations, there would then have been room for question [392] whether the conveyance, though voluntary, might not stand. In *Reade* v. *Livingston,* (4 *Johns. Ch. R.* 481,) Chancellor Kent, on a full review of the cases came to the conclusion that if the party be indebted at the time of the voluntary settlement, it is presumed to be fraudulent in respect to such debts, and *no circumstances will permit those debts to be affected by the settlement,* or repel the legal presumption of fraud. He adds, the presumption of law in this case does not depend *upon the amount of the debts, or the extent of the property in settlement, or the circumstances of the party.* It must be admitted that the rule has not always been carried to this extent, and I am not prepared to say that the language of the chancellor should not be taken with some qualifications. Still, it is impossible to read the cases on which he relies, and the argument by which his opinion is sustained, without feeling great difficulty in dissenting from

his conclusion. It certainly would not be a mischievous doctrine to hold that the rights of the creditor are, under all possible circumstances, superior to those of the donee of the property of his debtor. Such a rule would fully carry out the spirit and intent of the statute; it would be comprehended by all classes; its application would be certain and efficacious; it would teach men to be honest, and not attempt to build up their families at the expense of their creditors; it would put an end to a vast amount of legal controversy; and, finally, it would place the law upon the ground of that elevated morality, which in the disposition of our property, regards the claims of justice as superior to those of affection. But, I repeat, the rule has not always been carried so far; and it is unnecessary, in this case, to say what is the proper limit. When a man bestows all his estate upon his family, without regarding his legal obligation to others, there is no adjudged case, and I trust there never will be, which says that such a transaction can be supported.

There is another question upon which there has been some diversity of opinion; and although it does not materially affect the decision of this cause, it was [393] fully discussed on the argument, and ought, perhaps, to receive some notice.

In *Reade* v. *Livingston*, as we have already seen, the chancellor laid down the rule, that as against prior creditors, a voluntary conveyance is fraudulent and void under all possible circumstances. He held, also, that so far as concerned existing debts at the time of the conveyance, fraud was *an inference or presumption of law*, though it was otherwise in relation to subsequent creditors. This doctrine was followed by the supreme court in *Jackson* v. *Seward*, (5 Cowen, 67;) and although it had been conceded at the trial, that there was no actual fraudulent intent on the part of Seward, yet the court held on the facts proved, that the deed was fraudulent in law. But when the case was reviewed by this court, (8 Cowen, 406,) the doctrine of legal fraud was questioned by Senators Spencer and Allen, who thought that fraud was, in all cases, a question of *fact.* This opinion was afterwards followed by the supreme court in *Jackson* v. *Peck*, (4 Wendell, 300,) and *Jackson* v. *Timmerman*, (7 id. 436.) It is no doubt the duty of all subordinate tribunals to follow the decisions made by the court of the last resort; but it is impossible to say that this court has ever sanctioned the doctrine that the question of fraudulent intent, in a case like the one under consideration, was one of fact, not of law. It is possible that a majority of the court intended to follow the opinions of the two senators, instead of the opinions delivered by others; but that is more than can be positively affirmed. Chancellor Jones examined the special verdict at large, and came to the conclusion that it was so radically defective that he could not decide the questions of law raised by the parties; and he placed his opinion in favor of reversing the judgment upon that ground alone. I think it quite as probable that a majority of the court intended to follow the opinion of the chancellor, as it is to suppose that they intended to go beyond a defective special verdict, and pass upon a question which was not necessarily before the court. Senator Stebbins was of opinion that Van Wyck was not a creditor at the date of the deed, and it is possible that others may have concurred in that opinion. Senator Spencer thought the judg-[394]ment ought to be reversed, because the recovery improperly included two acres of land to which the plaintiff had shown no title; and it is not improbable that others entertained the same opinion. He also thought the special verdict defective, and was prepared to advise a reversal of the judgment, and a *venire de novo* on that ground. He, however, proceeded to examine the other questions which had been argued, and came to the conclusion, first, that this was not a voluntary conveyance; and, second, if it were voluntary, that the question of fraud was one of fact, to be determined by the jury; and inasmuch as the special verdict (as drawn up by the parties) found that there was no fraudulent intent, he was also for reversing the judgment on this ground.

It is then quite safe to conclude that this court has not advanced a single step

Van Wyck v. Seward.

towards denying the doctrine of legal fraud, as laid down by Chancellor Kent in *Reade* v. *Livingston*, and followed by the supreme court in *Jackson* v. *Seward*. Other cases might be added to those cited by the chancellor, and much might be said in support of his position; but it is not necessary to push the inquiry on the present occasion. The opinion entertained by Senator Spencer has found its way into the Revised Statutes, (2 *R. S.* 137, § 4;) and although that code does not form the rule of decision in this case, it will govern in most cases that may hereafter arise. And, besides, the diversity of opinion which prevails on this question, is of no great importance, except in trials at law; and then it relates principally to the proper distinction between the duty of the court and the province of the jury. Those who maintain that fraud is a question of fact for the jury, do not deny that a voluntary conveyance is *prima facie* fraudulent and void as against antecedent creditors. On the contrary, this position was distinctly admitted by both of the senators who controverted the doctrine of legal fraud in *Seward* v. *Jackson.* And here I must say, that nothing could be more erroneous than the remark made on the argument, that this court was now asked to reverse its own decision. Nothing was said by any member of the court on the former occasion, which at all conflicts with the opinion that this conveyance, if voluntary, was fraudulent and void as against antecedent creditors. The [395] case is now presented free from all the embarrassments which before stood in the way of deciding the controversy on its merits. Whether fraud be a question of fact or of law, is now a matter of little or no moment. We are sitting in review upon a decree in chancery, and in such cases we necessarily follow the constitution of that court, and pass upon the facts as well as the law, without the aid of a jury.

There was another feature in the argument for the respondents, which I ought perhaps to notice. Although the proposition was not directly advanced, it seemed to be assumed that if fraud was a question of fact, it was then incumbent on the appellant to make out an actual intent to do the wrong, and that this could only be established by direct proof of that particular fact. Whether the question be one of law or fact, a voluntary conveyance has always been held *prima facie* fraudulent and void as against antecedent creditors; and there is not, and never was, any rule which required that the intent to defraud should be made out by direct proof of that particular fact. In this, as well as in other cases where the *intention* with which an act is done is to be ascertained, it may be and usually is inferred or presumed from the knowledge of other facts. Men do not often declare their purpose when they are about to do an act injurious to others; and we have no means of arriving at a knowledge of the internal resolve or determination of the actor, but by reasoning or drawing inferences from his external conduct. To this kind of presumption we constantly resort, not only in civil but in criminal cases. It is not a mere rule of law or of evidence in courts of justice, but all men are in the habit of forming opinions and acting upon this kind of presumption. If a man take and conceal the goods of another, courts, jurors, and neighbors, all agree that he did the act with intent to steal. If one plunge a dagger in the bosom of another, no man will find any difficulty in drawing the inference that he intended to kill. "It is (says Mr. *Starkie*) an universal principle, that a man shall be taken to intend that which he does, or which is the immediate or necessary consequence of his act." [396] (2 *Stark. Ev.* 739.) Now, to apply this rule to the present case: When a debtor gives away all his property, it is a necessary consequence of the act that the creditor is injured; he is defrauded. This consequence the debtor intended to produce. He may also have had some other purpose in view; but this intent was part and parcel of his act. If a man, after contracting a legal obligation, make a voluntary conveyance of all his property, the language of the act is, that he intends to put it out of the power of the creditor to obtain satisfaction if the contract shall be broken. The defendants evidently felt the force of this

Van Wyck v. Seward.

reasoning when they put in their answer. They did not expect to gain much by the mere denial of a fraudulent intent, so long as it stood admitted that Seward gave away the means of satisfying his obligation to the appellant; and they therefore attempt to excuse the act, by alleging that Seward did not know at the time of the gift that he was under any legal obligation to the appellant. They say he did not know that the covenant bound him, or was in effect a guaranty beyond the lien of the judgment assigned. It is, at the best, a pretty lame excuse to say that the party did not know what contract he had made; but the apology is peculiarly unfortunate in this instance, because it is proved to be untrue. Mr. Hooker, who prepared the papers, swears, that after the assignment was drawn, and before it was executed, Van Wyck requested that the payment of the judgment should be guaranteed by Seward, to which Seward assented, and the guaranty was drawn and executed at the time of the assignment; and by reference to the instrument, it will be seen that a separate contract, in addition to the assignment, was executed by Seward for the sole purpose of obligating himself to pay the judgment, if not collected by the ordinary process of law against William Seward, jun. In addition to all this, Mr. Hooker testifies that Seward, a few weeks afterwards, applied to Van Wyck to give up the guaranty, but the parties were unable to agree on the terms, and it was retained. These facts place the family arrangement in a very bad light. [397] After deliberately entering into the contract, and after failing in a negotiation to be discharged from it, he puts it out of his power to perform it, by giving his property to his children. Under such circumstances, there can be no great difficulty in inferring an actual intent to defraud the appellant.

Another reason assigned in the answer why no fraud could have been intended is, that "William Seward lived a life of exemplary observance of the precepts of a religion, of which he was, in the vigor of his days, a preacher," and left behind him a good character. What religion in particular he promulgated, does not appear, nor am I concerned to know. Whatever may have been its form, it can not be a good plea in bar to a bill in equity. If his children truly reverence his memory, they would do better to satisfy this debt of three thousand dollars which he left behind him, than they do by holding on upon the twelve or fifteen thousand dollars' worth of property which they received from his bounty, and attempting to shield themselves under the cover of his religion.

The defendants deny that they knew of the covenant to the appellant until after the giving of the deed. I shall not stop to examine the truth of that allegation. The only inquiry is, with what intent was the *gift* made; not with what motive was it received. (*Patridge* v. *Gopp*, 1 *Eden*, 167; *Ambler*, 596, *S. C.*)

It is said that the property bound by the lien of the judgment against William Seward, jun., was of sufficient value to satisfy the debt, and that this fact will rebut the presumption of fraud. The argument amounts to this: William Seward believed, though the fact turned out otherwise, that the judgment would be collected by the ordinary process of law, and consequently that his covenant would not be broken; he therefore did not intend to commit a fraud when he put it out of his power to respond upon his contract, should he be legally required to do so. I deny that he had any right to speculate about the probability of a breach of his covenant. We have already seen that Van Wyck would not trust to the lien of the judgment; he required the additional security of Seward, whom [398] he knew to be a man of property, that he would make up any deficiency there might be after a sale of the property bound by the judgment. Seward deliberately made such a covenant, and afterwards thought it of sufficient importance to negotiate for having it given up. It was then too late for him to give away the estate to which the appellant looked for ultimate security, under the pretense that he supposed his covenant would never be broken. The argument only carries us back again in a new form to the question, whether the appellant was a creditor of Seward at the making of the deed; and denies that he was a creditor, because

Van Wyck v. Seward.

Seward was only bound by a contingent contract which might never be broken. If we admit the doctrine in this case, we admit it in all others of the like character. A surety who has given away all his property may then say, I intended no fraud, because I thought the debt would be paid by the principal; and the endorser may set up the same plea, because he thought the bill or note would be paid by the other parties who were primarily answerable. Sureties and endorsers are only bound by a contingent contract, which may never be broken. I have already shown, upon authority, that persons holding contracts upon which no action may ever accrue, are as fully entitled to the protection of the statute as any other creditors.

VI. The chancellor seems to have rested his opinion principally on the ground, that Seward, at the time of the conveyance, retained in his hands a sufficient amount of property to satisfy any amount of money that could be recovered on the covenant; and that this was a reasonable family settlement, in reference to the circumstances of himself and his children. Although the chancellor has not referred to any adjudged case in support of his opinion, I shall not venture to differ with him without inquiring how the question stands on authority. I have already cited the case of *Reade* v. *Livingston*, (3 *Johns Ch. R.* 481,) where chancellor *Kent* held, that a voluntary settlement, as against antecedent creditors, was void under all possible circumstances; and I have given some of the reasons why I think that a wholesome doctrine. I can perceive no great hardship in holding that the donee shall, in all cases, take and [399] hold the gift subject to the claims of those who were creditors of the donor at the time. As against the donee, this question never arises until the creditor has lost all other means of obtaining his demand. And why should he lose his debt, when the property, on the credit of which it was contracted, has neither been sold, lost, nor expended by the debtor in the course of his business, but has been given away to his family? Why should the right of the creditor to reach the property in the hands of the donee, depend on the inquiry whether the debtor parted with too much or too little of his property? Can there be any such thing as a *reasonable* family settlement, when it ultimately works injustice to the existing creditors of the grantor? I have never been able to discover the principle upon which a title acquired by mere gift, should, under any circumstances whatever, be deemed superior to the claim of the creditor to be paid his debt. But this question has sometimes been viewed in a different light, and I am not prepared to say but the weight of authority may be in favor of some qualification of the rule laid down in *Reade* v. *Livingston*. Still, I think there is no case which will uphold this settlement.

What were the circumstances of Seward, and what was the character of this settlement? He was not indebted merely in a small amount for the current expenses of himself and family, but had contracted an obligation, upon which he might become liable to pay nearly $3000. His farm was worth about $11,000, and his personal property, exclusive of the two bonds, was of the value of $1000. All this he gave to his children at the date of the deed. He kept nothing but the two bonds, amounting to a little over $2900. Without going any further, this does not seem to be a reasonable family settlement. But he soon afterwards made it still more unreasonable, by giving the bond for $900 to Philander. The remaining bond of $2000, was paid in November, 1818. What became of the money does not appear: but it does appear that *Seward* died in 1822, not worth one cent—and this notwithstanding the fact that he had all along enjoyed his $300 annuity. No one can doubt that the $2000 went the way of all the rest of his estate. If, then, Seward gave away $12,000 on one day, [400] $900 on another, and the remaining $2000 on a third, can we regard these as independent transactions, and hold that the first gift was valid because it did not include everything? I think not. All was done in pursuance of the avowed purpose of settling the whole estate upon his family in his lifetime.

Van Wyck v Seward.

But suppose we go back to the date of the deed. Seward was then worth a little short of $15,000. Was it a reasonable family settlement, as against creditors, to part with $12,000 worth of the estate? I have met with no case which affirms such a doctrine. But what was the ample fund which he retained on that day? It amounted to $2900, a sum which might not prove adequate to all his own wants for life, to say nothing of the claims of his creditors. Again, this fund was retained in the form of two choses in action, which could not be reached by execution. He did not keep a single dollar's worth of property which the creditor could reach in the ordinary forms of law. If there be any case saying that this was reserving an ample fund to discharge his legal obligations, it has not fallen under my observation.

Let us see how this question stands on authority—I mean those authorities most favorable to the defendants—the cases which have departed from what I deem the plain, practical, and honest rule, that the creditor must be paid before the donee can, under any circumstances, acquire an absolute right to hold the property. In *Hundal* v. *Wilder*, (4 *McCord*, 302,) the court said, that none of the cases allow a voluntary deed to prevail against existing creditors, "except in cases of *inconsiderable* debts, such for instance as those *current expenses* which every man is supposed to owe, and where he has at the time *ample funds* over and above the property given." Mr. Justice Story, after stating the general rule that a voluntary conveyance is void as against existing creditors, says the doctrine requires or may admit of some qualification, "where the circumstances of the

[401] indebtment and conveyance repel any possible imputation of fraud; as where the conveyance is of *a small property* by a person of *great wealth*, and his debts bear *a very small proportion* to his actual means." (1 *Story's Eq.* 347, 8.) In *Hinde's lessee* v. *Longworth*, (11 *Wheat.* 199,) the court said, the mere fact of being in debt to a small amount would not make the deed fraudulent, if it could be shown that the grantor was in prosperous circumstances and unembarrassed, and that the gift to the child was a reasonable provision according to his state and condition in life, and leaving enough for the payment of the debts of the grantor. In Connecticut, also, a voluntary deed is sometimes allowed to stand as against a creditor, but only under such circumstances as strongly tend to repel all presumption of fraud. In *Salmon* v. *Bennett*, (1 *Conn. R.* 525,) the property conveyed to the son only amounted to *one eighth* part of the real estate of the grantor, who was in prosperous circumstances, and the deed was upheld. But it is worthy of notice, that in this, as well as in most of the other cases which adopt a different rule from that laid down in *Reade* v. *Livingston*, the court proceed with a degree of caution which seems to indicate a distrust of the ground on which they were treading. Swift, C. J., in delivering the opinion, says : " Where there is no actual fraudulent intent, and a voluntary conveyance is made to a child in consideration of love and affection, if the grantor is in prosperous circumstances, unembarrassed, and *not considerably indebted*, and the gift is a *reasonable* provision for the child according to his state and condition in life, comprehending but *a small portion* of his estate, leaving *ample funds unincumbered* for the payment of the grantor's debts, then such conveyance will be valid." It needs no commentary upon these cases, to prove that they will not answer the purpose of the defendants.

In *Backhouse* v. *Jett*, (1 *Brock.* 500,) the donor was in good credit, and there were no circumstances from which fraud in fact, or actual bad faith on his part, could be inferred. In this situation he gave *half* of his estate to his only son for his establishment in life. Chief Justice Marshall held the gift void as to creditors, and decreed accordingly. In *Hopkirk* v. *Randolph*, (2 *Brock.* 132,)

[402] this question came again under the consideration of the same learned judge.

He says, the cases determine that a voluntary gift is void as to creditors whose debts existed at the time the gift was made. This is the general principle, and as a general principle, it is believed to be unquestionably a sound one. But

Van Wyck v. Seward.

he thinks the rule is not universal—not so inflexible as under all possible circumstances to avoid every gift made by a person indebted, "however large his fortune, and however inconsiderable his debts, or his gift." Thomas Randolph, previous to the intermarriage of his daughter, had given her two negro girls, one of them an attendant on her person, and a riding horse. The donor, as the case states, "was a gentleman of *ample fortune*, not embarrassed in his circumstances, nor so much indebted as to create any suspicion of difficulty in the payment of his debts." The chief justice said, the gift of the waiting maid and the riding horse "are *usual* in this country, and comes strictly, *when made by a parent of unquestionable solidity*, within that class of gifts which are denominated *presents*. They do not much differ from wedding clothes, if rather more expensive than usual, from jewels, or an instrument of music, given by a man whose circumstances justified the gift." He adds, "the gift of the other girl is not, I think, so perfectly clear," but having been made with intentions perfectly fair, he was disposed to uphold it. He then proceeds, as though not fully satisfied with his position, to notice the fact that the property had been given to the daughter, and had become ostensibly hers before the marriage; and refers to some *English* decisions which hold, that in case of a voluntary settlement, the circumstance of its leading to a marriage, makes the settlement good against creditors, though it would have been bad if no marriage had taken place. If this distinguished jurist found so much difficulty in upholding a trifling gift, or mere "present" to a daughter, by a man of "ample fortune," it will be impossible to uphold the gift made by Seward, which, in the most favorable view that can be taken of the case, amounted to more than four fifths of his whole property, and included every thing within the reach of execution.

VII. If there can be any doubt, either upon principle or authority, that [403] the whole transaction was void as against creditors—if Philander Seward may be regarded as having paid some valuable consideration so as to give him to any extent the character of a purchaser—still the bonds to the two daughters were clearly voluntary. The answer admits, in terms, that the sums contained in the bonds were wholly and entirely a voluntary gift to the daughters respectively. There is no principle which will withhold these bonds from the creditor, and if the money has been paid, the daughters and their husbands are liable to account and pay it over. See the opinion of Spencer, senator, in *Seward v. Jackson*, (8 *Cowen*, 431.) The point was directly decided by Chief Justice Marshall, in *Hopkirk* v. *Randolph*, (2 *Brock.* 132.) Thomas Randolph, on dividing the greater part of his estate among his sons, required each of them to execute a bond to pay £250 to his son-in-law, Harrison. It was held that Harrison should pay over to the creditor the money received on the bonds; and on a re-argument, the chief justice, though he thought it a hard case, adhered to his opinion. Another point was decided—that Harrison was accountable, not only for such proportion of the debts of the donor as the property received by him bore to the property received by the sons, but for all that he had received. The sons had wasted their portion of the estate, and were unable to respond to the creditor. This is, I think, a sound principle. The creditor may call on any one who has the property of his debtor by mere gift, to pay it over, without being compelled to inquire whether some one else ought not to contribute. Let volunteers settle that matter between themselves. The question is not important in this case, because all necessary parties are before the court. There is no evidence that the other children of Seward have received anything from him since the debt to Van Wyck was contracted. The amount of the two bonds to the daughters is much more than sufficient to satisfy the debt of the appellant.

Pursuing the same views of the case, and supposing that the whole transaction was not utterly void, still Philander would be liable as a [404] volunteer to account to the creditor for the excess in value of the property beyond the amount he has paid. This point was also considered in *Hopkirk* v.

213

Van Wyck *v.* Seward.

*Randolph.* The sons, on receiving the property, stipulated to pay certain debts, and each gave a bond to pay £250 to their brother-in-law Harrison. The chief justice said: " Where a conveyance is made to children, of property to a large amount charged with debts bearing no proportion to its value, the children cannot be considered as purchasers of the whole, but must take the clear surplus value of the property as volunteers." How will the case stand upon this doctrine as to Philander, considering it in the most favorable light for him ? He received the farm, personal property, and one bond, to say nothing of the other, amounting together in value to $12,900, and upwards. If the annuity is regarded as part consideration for a purchase, and not as a rent for the use of the farm, what was its present value at the time of the conveyance ? Seward was then seventy-one years old. Supposing him to enjoy ordinary health, and the interest of money to be seven per cent., the present value of the annuity of $500 was $2609 ; but regarding his infirmities as they are described in the answer and by the testimony of his widow, the annuity was not worth more than two thirds of that sum, or less than $1750. If the bonds to Rebecca and Electa, which amounted to about $4450, are added, it will make about $6200. Deducting this sum from the value of the property received by Philander, it will be seen that the amount of his gift was $6700. For this sum he is liable to account to the creditor, and it is more than double the amount of the debt.

In every view which I have been able to take of this case, the appellant is entitled to the payment of his debt. Whether fraud be a question of law or of fact, the conclusion is the same. And although there are cases which maintain that a voluntary conveyance may, under very special circumstances, be good as against antecedent creditors, yet there is no case which goes far enough to uphold this transaction. The whole current of legal adjudication is the other way.

[405] Should we consider the question independent of all authority, and try it by the rules of common sense and common honesty, the result will be the same. The statute declares that all gifts, grants, &c., made with intent to delay, hinder, or defraud creditors and others, shall be utterly void. Seward, after contracting an obligation to the appellant on which he ultimately became liable to pay nearly $3000, gave his children, who are defendants, the whole, or at the least six sevenths of his estate, worth about $15,000, and soon afterwards died insolvent. The appellant has not been paid his debt. The making of the gift was an act directly calculated, in the words of the statute, to delay, hinder, and defraud the creditor; and it has actually worked that consequence. The creditor has in fact been hindered, delayed, and defrauded. Can the gift be maintained without repealing the statute ? Can the defendants hold the property and not pay the debt ? Let me once more borrow the language of Chief Justice Savage, in *Mackie* v. *Cairns.* " To state such a proposition," says he, " is a sufficient refutation of it. It offends the moral sense; it shocks the conscience, and produces an exclamation. It is directly against the statute, and cannot stand before it."

The prayer of the bill is, that the deed be delivered up to be cancelled, or that the appellant be paid his debt. The latter alternative will be the most favorable to the defendants. I think the decree of the court of chancery should be reversed ; and that a decree should be entered declaring the deed fraudulent and void as against the appellant, and that it be delivered up to be cancelled, unless the defendants shall, within sixty days, satisfy the appellant's judgment and his costs in the court of chancery to be taxed.

Senator TRACY concurred with Justice Bronson in opinion that the case of *Jackson* v. *Sward*, (8 *Cowen*, 429,) did not govern the decision of the case now before the court; that it is difficult to say what rule of law is established by that case beyond the point that a *guarantor* is to be considered in the light of a *debtor* within the meaning of the statute of frauds. He also concurred with Jus-

tice Bronson in holding that the conveyance of the property should be [406] deemed to be in the nature of a testamentary disposition, and ought not to be held a sale; and viewing it in that light he had no hesitation in saying, that upon the principles of immutable justice a *creditor* has an equitable lien upon the property of his debtor superior to that of a naked *donee*.

Senator MAISON had supposed that there would not be a dissenting voice in affirming the decree of the chancellor. This court had said in the case of *Jackson* v. *Seward*, that this very conveyance, which was then under consideration, was not fraudulent, and he trusted that the decision then made would be adhered to. That case destroyed the distinction which had been supposed to exist between *fraud in law* and *fraud in fact*, and the principles then established ought to control the decision of this case. Besides, when a party comes into a court of equity and invokes its equitable powers, he must do equity to those against whom he seeks relief. The appellant here has been fully paid if he is held accountable for the fair value of the lands purchased by him under the assigned judgment, and in his opinion he should be held so accountable, and if so, he had no pretense of claim against the respondents.

On the question being put, *Shall this decree be reversed?* the members of the court divided as follows:

*In the affirmative: Justice* BRONSON, and *Senators* ARMSTRONG, J. BEARDSLEY, L. BEARDSLEY, DICKINSON, HUNTER, LAWYER, POWERS, SEGER, SPRAKER, TRACY, VAN DYCK, WAGER, WORKS—14.

*In the negative: Senators* BECKWITH, DOWNING, EDWARDS, FOX, HUNTINGTON, H. F. JONES, J. P. JONES, LACY, LIVINGSTON, LOOMIS, McLEAN, MAISON, PAIGE, STERLING, WILLES—15.

Whereupon the decree was AFFIRMED.